810 A.2d 1257

COMMONWEALTH of Pennsylvania, Appellee

v.

Kevin MARINELLI, Appellant.

Supreme Court of Pennsylvania.

Submitted April 15, 2002.

Decided Nov. 25, 2002.

*se* undermine the date designation for purposes of identifying the relevant compliance period.

624

628

Billy Horatio Nolas, Philadelphia, for appellant, Kevin Marinelli.

Ann Targonski, Sunbury, for appellee, Com. of PA.

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## *OPINION*

Justice NEWMAN.

Kevin Marinelli (Marinelli) appeals from an Order of the Court of Common Pleas of Northumberland County (PCRA court), denying his Petition for Post–Conviction Relief pursuant to the Post Conviction Relief Act[1] (PCRA). For the reasons set forth herein, we affirm in part and reverse in part the Order of the PCRA court and remand the matter for proceedings consistent with this Opinion.

## *FACTS AND PROCEDURAL HISTORY*

The evidence submitted at trial, as summarized by the 1997 opinion of this Court on direct review, authored by Justice Cappy, established the following:

> On the evening of April 26, 1994, [Marinelli], his brother, Mark Marinelli (Mark), and [co-defendant Thomas] Kirchoff met at [Marinelli's] apartment to plan a burglary of the residence of Conrad Dumchock (Dumchock), whom Mark knew to have stereo equipment. The three men obtained weapons, disguises, and gloves in preparation for the burglary, and proceeded to Dumchock's home in Kulpmont. Dumchock was home alone and had just spoken to his sister and brother-in-law on the telephone for forty-five minutes. The Marinelli brothers and Kirchoff arrived at Dumchock's home and initially had difficulty gaining entry. Observing that Dumchock's car was parked outside his house and concerned about the possibility of being discovered, the threesome left Dumchock's residence but returned a few minutes later to again attempt to enter. Eventually, they broke a small window in the kitchen door and entered the residence.
>
> Upon entering Dumchock's residence, [Marinelli] immediately proceeded to the second floor, where he encountered Dumchock. When Dumchock requested that [Marinelli] leave his home, [Marinelli] struck Dumchock's face with his gun and yelled for assistance from Mark and Kirchoff.

1. 42 Pa.C.S. § 9541, *et seq.*

[Marinelli] and Kirchoff continued to beat Dumchock, despite Dumchock's pleading with them to take what they wanted and leave him alone. The three rummaged through Dumchock's home looking for items to take and asking Dumchock where his guns and money were located. When Dumchock would moan or not answer, [Marinelli] would hit Dumchock again.

Mark and Kirchoff departed Dumchock's home after they had loaded the items they wished to steal, while [Marinelli] remained in the residence with Dumchock. [Marinelli] then shot Dumchock twice in the head, with one shot into Dumchock's eye and the other directly between Dumchock's eyes. [Marinelli] then ran out of Dumchock's house and exclaimed, "Let's get out of here!"

The threesome returned to Kirchoff's home and divided the items stolen from Dumchock. A short while later, the Marinelli brothers returned to Dumchock's house and took a motorcycle from the victim's porch. [Marinelli] attempted to start the motorcycle on compression, with Mark following in a car. They were observed crossing the main road in Kulpmont heading toward the other side of town. When the motorcycle would not start, [Marinelli] abandoned it. On the morning following the killing, Clyde Metzger, who was waiting for Dumchock to drive him to work, entered the victim's home and discovered Dumchock's stereo equipment had been disarranged and Dumchock's dog was shaking. Metzger called out to Dumchock but received no response. Metzger became concerned and left Dumchock's home, and headed to the police station. On his way there, Metzger encountered a Kulpmont Police Sergeant Detective Robert Muldowney, and related to him the circumstances he had found.

Sergeant Muldowney entered Dumchock's home, noting that the storm door was open, the inside door was propped open with a chair, and the glass had been broken from a window in the door. Inside the house, Sergeant Muldowney discovered that telephone cords had been cut. Upstairs, Sergeant Muldowney discovered the victim's cold body lying at the

top of the stairway landing. Sergeant Muldowney noted that Dumchock's bedroom was disheveled, with drawers removed from the dresser and various items strewn on the victim's bed. Pennsylvania State Police and County Coroner Richard Ulrich were called to the scene. The victim's sister also arrived at his house and noted that Dumchock's motorcycle was missing. The motorcycle was later recovered hidden in some brush where it had been abandoned. Dumchock's brother-in-law informed police that guns, tools, and electronic equipment were also missing from Dumchock's residence. One of Dumchock's friends, David Dormer, was brought to Dumchock's residence to assist police in determining which stereo equipment, as well as liquor, was missing.

On May 25, 1994, Mark Marinelli's girlfriend, Deeann Chamberlain, turned over to Coal Township Police certain weapons which Mark had brought to her home. These weapons were later identified as having belonged to the victim. County Coroner Ulrich was at the Coal Township police station when Ms. Chamberlain turned over these weapons. The coroner connected the items with the Dumchock killing, and notified the District Attorney and State Police. Further, Ms. Chamberlain allowed Shamokin Police to come to her home and remove other items Mark had left there, including a telephone answering machine. Coroner Ulrich recognized the telephone answering machine as being of the type reported missing from Dumchock's house, and he notified the State Police.

Additionally, a friend of [Marinelli], Nathan Reigle, was questioned by police about the Dumchock murder. Reigle stated to police that [Marinelli] had bragged about how he had killed Dumchock. A search of [Marinelli's] residence by police recovered a number of items, including stereo equipment, later identified as property belonging to the victim. After being questioned by police, [Marinelli] gave police both an oral and a taped confession as to his involvement in the Dumchock killing.

*Commonwealth v. Marinelli,* 547 Pa. 294, 690 A.2d 203, 209–
210 (1997), *cert. denied,* 523 U.S. 1024, 118 S.Ct. 1309, 140
L.Ed.2d 473 (1998).

The Commonwealth tried Marinelli and Kirchoff for the
homicide of Dumchock.[2] Following a joint trial conducted
from May 12, 1995, through May 18, 1995, a jury convicted
Marinelli of murder in the first degree,[3] robbery,[4] conspiracy
to commit robbery,[5] burglary,[6] theft by unlawful taking,[7] re-
ceiving stolen property,[8] and aggravated assault.[9] The jury
convicted Kirchoff of all of the same crimes, save murder in
the first degree, convicting him instead of murder in the
second degree.[10] Following a penalty hearing limited to Mari-
nelli, the same jury found two aggravating circumstances, that
Marinelli committed the killing while in the perpetration of a
felony [11] and that he committed the offense by means of
torture,[12] and two mitigating circumstances, that Marinelli had
no significant history of prior convictions [13] and other evidence
concerning Marinelli's character and record.[14] The jury con-
cluded that the aggravating circumstances outweighed the
mitigating circumstances and, accordingly, sentenced Marinelli
to death. The trial court sentenced Marinelli to additional
terms of imprisonment of ten to twenty years for robbery, five
to ten years for conspiracy, and ten to twenty years for
burglary, each sentence to run consecutive to all other sen-

**2.** Mark pled guilty to murder in the second degree in exchange for his
testimony against Marinelli and Kirchoff.

**3.** 18 Pa.C.S. § 2502(a).

**4.** 18 Pa.C.S. § 3701.

**5.** 18 Pa.C.S. § 903.

**6.** 18 Pa.C.S. § 3502.

**7.** 18 Pa.C.S. § 3921.

**8.** 18 Pa.C.S. § 3925.

**9.** 18 Pa.C.S. § 2702.

**10.** 18 Pa.C.S. § 2502(b).

**11.** 42 Pa.C.S. § 9711(d)(6).

**12.** 42 Pa.C.S. § 9711(d)(8).

**13.** 42 Pa.C.S. § 9711(e)(1).

**14.** 42 Pa.C.S. § 9711(e)(8).

tences. On direct appeal, this Court affirmed the convictions and judgments of sentence. *Marinelli*, 690 A.2d at 222. The same attorney, James J. Rosini, Esq. (Rosini), represented Marinelli at trial and on direct appeal.

Marinelli filed a timely *pro se* Petition for Post–Conviction Relief and request for appointment of counsel on April 28, 1998. The PCRA court appointed counsel, who filed an Amended PCRA Petition on October 13, 1998 (First Amended Petition). Original PCRA counsel ceased representation of Marinelli on October 22, 1999, at which time second PCRA counsel entered an appearance on behalf of Marinelli. The PCRA court conducted an evidentiary hearing on the Amended PCRA Petition from January 24, 2000, through January 27, 2000. On March 22, 2000, second PCRA counsel filed a Second Amended PCRA Petition (Second Amended Petition). On March 28, 2000, the PCRA court ordered the parties to file post-hearing briefs on the issues raised at the January 2000 hearing. The PCRA court received these briefs from both the Commonwealth and second PCRA counsel in March of 2001 and entertained arguments on May 1, 2001, on the additional issue raised in the Second Amended Petition and the issues discussed in Marinelli's post-hearing briefs. By Opinion and Order dated May 15, 2001, the PCRA court denied Marinelli's request for post-conviction relief. Also on May 15, 2001, second PCRA counsel withdrew and current PCRA counsel substituted his appearance for that of second PCRA counsel.

## DISCUSSION [15]

On appeal to this Court, Marinelli raises thirteen claims attacking his convictions and sentences. For clarity of discussion, we group together those claims that we dispose of in similar fashion and state each such issue at that time.

### Waiver Analysis

■ The PCRA court determined that Marinelli waived each of the following eight claims because he did not properly

---

**15.** We have renumbered the issues raised by Marinelli in this appeal for ease of discussion.

preserve them by raising them in either his Second Amended Petition or in his Post-Hearing Memorandum:

1. Should Marinelli's death sentence be vacated because he was denied an impartial capital sentencing jury and, as a result, consideration of mitigating evidence was restricted, in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, sections 9 and 13 of the Pennsylvania Constitution?

2. Is Marinelli entitled to a new sentencing proceedings because the trial court's penalty phase instructions improperly shifted the burden of persuasion from the Commonwealth to Marinelli and violated the presumption of life afforded defendants in capital sentencing proceedings, in violation of the Sixth, Eighth, and Fourteenth Amendments?

3. Is Marinelli entitled to a new trial because Juror Clara Iwanski was a former client of an Assistant District Attorney involved in the case?

4. Should Marinelli's death sentence be vacated because the sentencing jury was never instructed that, if sentenced to life, Marinelli would be statutorily ineligible for parole?

5. Was counsel ineffective for "misapprising" Marinelli of his right to testify to personal background mitigating circumstances without being subject to cross-examination on the circumstances of the offense, and was Marinelli's waiver of his right to testify in mitigation invalid, in violation of the Sixth, Eighth, and Fourteenth Amendments?

6. Is relief appropriate because the trial court failed to properly instruct on the nature and use of aggravating and mitigating factors, in violation of the Sixth, Eighth, and Fourteenth Amendments?

7. Is Marinelli entitled to the production of the remaining *voir dire* transcripts and restoration of his right to direct appeal, *nunc pro tunc*, because the Notes of Testimony of the *voir dire* proceedings were unavailable to him, in violation of due process under the Fourteenth Amendment?

8. Should Marinelli's death sentence be vacated because the Pennsylvania Supreme Court failed to provide him meaningful proportionality review in violation of 42 Pa.C.S. § 9711(h)(3)(iii) and the state and federal constitutions?

We find the determination of the PCRA court that these issues were waived to be flawed. Pursuant to 42 Pa.C.S. § 9543(a)(3), "[t]o be eligible for relief under [the PCRA], the petitioner must plead and prove by a preponderance of the evidence ... [t]hat the allegation of error has not been previously litigated or waived." The PCRA provides that "an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, on appeal or in a prior state postconviction proceeding." 42 Pa.C.S. § 9544(b).

Marinelli raised each of these issues in his First Amended Petition. (Petition for Statutory Post–Conviction Relief, October 13, 1998, at i-vii). In his Second Amended Petition, Marinelli incorporated by reference all of these issues. (Second Amended Petition for Statutory Post–Conviction Relief, March 21, 2000, at ¶ 16). In his Post–Hearing Memorandum, counsel for Marinelli expressly stated the following:

> [Marinelli] has previously discussed the relevant legal principles attendant to each claim asserted for relief within his PCRA Petition. Accordingly, [Marinelli] will address only those non-record claims upon which evidentiary resolution was provided by the [PCRA] Court. As to the record based claims [Marinelli] will rely upon the arguments and legal authority contained within his PCRA petition, accompanying Appendix, and Application for the Exercise of King's Bench Power to the Pennsylvania Supreme Court.

(Post–Hearing Memorandum, January 5, 2001, at 1–2).

The practical effect of the ruling of the PCRA court is to reject Marinelli's attempt to incorporate these issues, which he raised in his First Amended Petition, into his Second Amended Petition and subsequent Post Hearing Memorandum. In doing so, the PCRA court relied on the following Order it filed on March 28, 2000:

AND NOW, this 28th day of March, 2000, after hearing held, on the PCRA Application and testimony thereon being completed, the Defense is hereby ORDERED to filed it's [sic] Brief on the issues raised by said hearing within thirty (30) days of this Order and the Commonwealth is OR-DERED to filed [sic] their [sic] responsive Brief within fifteen (15) days after the filing of the Defendant's Brief.

(Order of the PCRA Court, March 28, 2000, at 1). However, this Order does not expressly state that Marinelli will abandon any issue not fully re-briefed in the Post–Hearing Memorandum. Marinelli reasonably believed that a repetition of his 247–page, First Amended Petition would not be necessary, choosing instead to re-brief only those issues that were the focus of the original hearing. The PCRA court did not give Marinelli a clear and unambiguous directive to fully re-brief in the Post–Hearing Memorandum all issues that he wished to preserve. Accordingly, we refuse to conclude that Marinelli's decision to incorporate his lengthy First Amended Petition by reference, instead of repeating the identical arguments, operated as an abandonment of the issues fully briefed in the First Amended Petition. Marinelli's decision in his Post–Hearing Memorandum to incorporate by reference the legal arguments that he presented in his First Amended Petition was sufficient to avoid abandonment of those issues. We hold that to the extent that Marinelli raised claims cognizable under the PCRA, these claims should have been reviewed.[16] Because the PCRA court did not address these issues, we remand the matter to that court for a consideration of these eight claims.

### Previously Litigated Claims

■■■■ In addition to the preceding eight claims, the PCRA court also determined that Marinelli waived the following two

---

**16.** Even though it appears from the Questions Presented that a majority of Marinelli's claims allege trial court error, which are waived pursuant to the PCRA, in the body of his two amended PCRA petitions, he argues for each of these claims that his conviction and/or sentence were the result of one or more of the specifically enumerated errors or defects that are reviewable pursuant to the PCRA. *See* 42 Pa.C.S. § 9543(a)(2)(i)–(viii). It appears from Marinelli's Petition that he comported with the threshold requirements of the PCRA in seeking review of his arguments.

issues because he did not properly preserve them by raising them in either his Second Amended Petition or in his Post–Hearing Memorandum:

> 9. Did the admission in this joint trial of the non-testifying co-defendant's confession, where the term "the other guy" unmistakably referred to Marinelli, violate the Sixth, Eighth, and Fourteenth Amendments?

> 10. Was the torture instruction, especially in conjunction with the prosecutor's argument, unconstitutionally vague, overbroad, arbitrary and capricious, in violation of the Sixth, Eighth, and Fourteenth Amendments?

As discussed above, the PCRA court improperly determined that Marinelli waived these arguments. However, this Court discussed and rejected both of these claims on direct appeal. *Marinelli*, 690 A.2d at 220. Pursuant to 42 Pa.C.S. § 9544(a)(2), an issue has been previously litigated if the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue[.] A PCRA petitioner "cannot obtain post-conviction review of claims that were previously litigated by alleging ineffectiveness of prior counsel and presenting new theories of relief to support a previously litigated claim." *Commonwealth v. Miller*, 560 Pa. 500, 746 A.2d 592, 602, n. 9. Accordingly, these issues are not appropriate for collateral review.

■ Because the PCRA court fully considered the final three issues, we will now address those averments *seriatim*.[17]

*Allegedly Inflammatory and Misleading Expert Testimony*

> 11. Should Marinelli's conviction and death sentence be vacated because they were obtained by inflammatory, unscientific, unreliable, and misleading expert testimony?

17. Claims 11 and 12 could have been raised on direct appeal, but were not. Accordingly, they are waived. 42 Pa.C.S. § 9544(b). In his brief to this Court, Marinelli presents these claims as ones of ineffective assistance of prior counsel for failing to raise them. Because Marinelli was represented by the same counsel at trial, sentencing, and on direct appeal, the PCRA court was his first opportunity to raise these contentions. Marinelli has presented these contentions in a manner sufficient for us to review them. *Commonwealth v. Marrero*, 561 Pa. 100, 748 A.2d 202 (2000); *Commonwealth v. Bracey*, 787 A.2d 344 (Pa.2001).

■ Marinelli next alleges that Dr. Isadore Mihalakis (Dr. Mihalakis), a forensic pathologist, answered questions concerning crime scene analysis and bullet trajectory that were outside of his expert discipline, and that trial counsel, Rosini, was ineffective for failing to object to the testimony of Dr. Mihalakis, or in the alternative, effectively cross-examine the doctor or present his own witnesses to counterbalance the testimony. The trial court qualified Dr. Mihalakis, who performed the autopsy on Dumchock, as an expert in the field of forensic pathology. On direct appeal, we characterized the testimony of Dr. Mihalakis as follows:

A forensic pathologist, Dr. Isidore [sic] Mihalakis, determined the victim's cause of death was two gunshot wounds to his head, and the killing was considered a homicide. Dr. Mihalakis testified that prior to receiving the two gunshot wounds to his head, the victim received two types of impact injuries: those from a cylindrical object, consistent with the throat of a baseball bat, and those administered by kicks. The victim had separate injuries to his left arm and hand, and had injuries to his left leg, upper chest, right side of his abdomen, right hand, base of his neck and the skin around his neck, left ear, cheek, head and scalp. The victim suffered twelve fractures to his ribs, and forty-seven blunt force injuries in all.

Dr. Mihalakis testified the victim's bruises indicated that considerable force was used on him and that he suffered extreme pain as a result of the beating. Dr. Mihalakis further determined that the victim's wounds resulted from a beating which lasted at least one half hour and perhaps as long as two hours. Moreover, the forensic pathologist determined that because there was gunpowder residue present on the victim's hand from his attempt to ward off his killer and his eye was open at the time he was shot, the victim had been conscious and aware of what was happening during the beating.

*Marinelli*, 690 A.2d at 212. Marinelli submits that this testimony was unfairly prejudicial to him during both the guilt and penalty phases of his trial. Marinelli posits that Dr. Mihalak-

is' unscientific and misleading opinion unfairly foreclosed to him potential defenses of duress, lack of specific intent to kill, and that the gunshot wounds were not the cause of death, and the testimony was critical to the prosecution in establishing the torture aggravating circumstance.

In effect, Marinelli is raising three separate claims: (1) counsel rendered ineffective assistance by failing to object to portions of the testimony of Dr. Mihalakis; (2) counsel rendered ineffective assistance by failing to adequately cross-examine Dr. Mihalakis on these points; and (3) counsel rendered ineffective assistance by failing to call defense experts to rebut this testimony. It is well-settled that one alleging ineffective assistance of counsel must show: (1) that the [underlying] claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and, (3) that, but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. Kimball*, 555 Pa. 299, 724 A.2d 326, 333 (1999). Counsel will not be deemed ineffective for failing to raise a meritless claim. *Commonwealth v. Tilley*, 566 Pa. 312, 780 A.2d 649 (2001).

"[T]he question whether a witness is qualified to testify as an 'expert' is within the sound discretion of the trial court and will not be overturned except in clear cases of abuse." *Commonwealth v. Bennett*, 471 Pa. 419, 370 A.2d 373, 375 (1977). "In Pennsylvania, a liberal standard for the qualification of an expert prevails. Generally, 'if a witness has any reasonable pretension to specialized knowledge on the subject matter under investigation he may testify and the weight to be given to his evidence is for the [fact finder].'" *Commonwealth v. Gonzalez*, 519 Pa. 116, 546 A.2d 26, 31 (1988) (quoting *Kuisis v. Baldwin–Lima–Hamilton Corp.*, 457 Pa. 321, 319 A.2d 914, 924 (1974)). "It is also well established that an expert may render an opinion based on training and experience; formal education on the subject matter is not necessarily required." *Commonwealth v. Copenhefer*, 553 Pa. 285, 719 A.2d 242, 255 (1998), *cert. denied*, 528 U.S. 830, 120 S.Ct. 86, 145 L.Ed.2d 73 (1999).

Marinelli does not argue that Dr. Mihalakis should not have been qualified as an expert; rather, he posits that Dr. Mihalakis exceeded his expertise when he testified about: (1) gunshot residue on Dumchock's hands; (2) the significance of Dumchock's eyes being open at the time of the shooting; and (3) the trajectory of bullets, based on the location of shell casings recovered from the floor of the crime scene. Clearly, gunshot residue on the hands of a murder victim and the state of consciousness of that victim at the time of the shooting are within the expertise of a forensic pathologist and trial counsel was not ineffective for failing to object to that testimony. Whether Dr. Mihalakis exceeded the scope of his expertise in testifying about the trajectory of bullets based on the locations of the shell casings, however, is not as clear.

 When questioned by the prosecution at trial, Dr. Mihalakis testified concerning the bullet trajectories as follows:

Q: Dr. Mihalakis, if there were testimony that—testimony that a casing from a .25 caliber bullet was found—let the record reflect that I'm pointing to the area of a hallway located behind the body in the area that is adjacent to the top of a stairway. If the casing was—one casing was found in this particular area and there's testimony that the second casing was behind the body, with respect to your expertise of gunshots and so forth, where would the shooter most likely be located.

A: The shooter, Mr. Sacavage, would have to be in the hallway because the vast majority of automatic or semi-automatic firearms, they will eject to the right, some forward, some to the side, some backward. So that if we find a bullet—a casing rather—then we know that since there is a stairway and there is a wall, the options for the individual who is doing the shooting are very limited and he has to be in the hallway at the—close to the foot end of the body or near there.

Q: And if there were some testimony that one of the assailants stated that when he fired the shots that he was— I'm just outlining an area that I will describe as the

southeast corner bedroom, and I'm pointing to an area, doctor, where the lines are broken up and that would be an exit to a stairwell, to an attic stairwell; if the shooter is describing to a person that he shot the bullets from the area near the entrance to the attic where the pointer is pointing to, would that be consistent with the distance to the gunshot and what would you say with regard to the casings that were described out in the hallway.

A: Well, there are two questions here. The first is, "Is it consistent with the distance?" I said that the one at the inner end of the left eyebrow is a near contact wound or extremely close range. Therefore the distance is proximal. The wound to the globe of the left eye, I can't tell where—it could be distant, but it could be close range. There is nothing in the white of the eye to indicate any residue. So therefore assuming distance the distance may correspond. However the location of the casings or the empty cartridges does not correspond because they were found within the hallway.

Q: In light of the position of the casings and the gunshot residue, would you have an opinion in light of those factors whether the shooter would have been located in the area I'm pointing to near the exit . . . to an attic stairwell?

A: Yes, I have an opinion.

Q: Would you give that opinion to the jury?

A: That the individual or individuals doing the shooting could not have been in that location.

(Notes of Testimony, Trial Hearing (Trial N.T.), dated 5/12// 95, at 181–183). The Commonwealth contends that a forensic pathologist can determine, from the location and type of the wounds, the path of the bullets in the body, and the gunshot residue present, whether the wound was proximal and from where the bullet originated. Marinelli concedes that it is within the expertise of a forensic pathologist to determine whether a wound was proximally inflicted, but submits that Dr. Mihalakis had no expertise from which to testify about the location of the shooter.

While the underlying claim may have arguable merit, Marinelli has failed to demonstrate that counsel did not have a reasonable basis for objecting to this testimony. When questioned by Marinelli's PCRA counsel at the PCRA hearing, Rosini, the trial, sentencing, and direct appeal attorney of Marinelli, testified as follows:

Q: Did you have a tactical or strategic reason for not objecting to—and this is my characterization, Dr. Mihalakis testifying outside his field, that he was qualified in Pennsylvania, in forensic pathology?

A: I don't know what specific testimony you're referring to.

Q: Do you recall whether or not Dr. Mihalakis started making reference to forensic ballistic issues? For example, how a shell ejected from a semiautomatic weapon?

A: I vaguely recall that. Do you want me to answer the initial question? I believe the question was, did I have a tactical reason for not objecting to that?

Q: Yes.

A: Yes. Tactically, as far as I was concerned the manner of death was never an issue. . . . So those questions I did not feel—I attempt, when I am trying a case, to not object to things that are not relevant to the strategy I'm using. So, where the shell went or who handled the gun, or the method of death, at that time and that place was not an issue. So there was no real point in objecting to it.

(Notes of Testimony, PCRA Hearing (PCRA N.T.), dated 1/24/00—1/27/00, at 233–234). As Rosini indicated at the PCRA hearing, this issue was irrelevant to trial strategy, which was to say that Marinelli was involved in the shooting, but that his involvement was forced by Mark and Kirchoff. Accordingly, Rosini testified that "the strategy was not to say he did not do it, but [rather] to mitigate his involvement." (PCRA N.T., 1/24/00—1/27/00, at 252). Thus, Rosini had a reasonable strategic basis for failing to object to this testimony as it was not inconsistent with Marinelli's defense.

Marinelli's other contentions in this regard are that Rosini was ineffective for failing to call defense expert witnesses to rebut the testimony of Dr. Mihalakis and for failing to properly cross-examine the doctor. "Trial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony." *Copenhefer*, 719 A.2d at 253; *accord Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251, 1265 (1994). Additionally, "trial counsel will not be deemed ineffective for failing to call a medical, forensic, or scientific expert merely to critically evaluate expert testimony which was presented by the prosecution." *Copenhefer*, 719 A.2d at 253, n. 12. Thus, the question becomes whether or not Rosini effectively cross-examined Dr. Mihalakis. The testimony of Dr. Mihalakis about the trajectory of the bullets and the gunshot residue on Dumchock was not inconsistent with the trial strategy of Rosini, either during the guilt phase or the penalty phase. Thus, Rosini had a reasonable strategic basis for not cross-examining Dr. Mihalakis on these issues. Whether the victim's eyes were open and, thus, whether Dumchock was conscious at the time of the shooting, however, was material to the existence of the torture aggravating circumstance. Accordingly, we must determine whether Rosini effectively cross-examined Dr. Mihalakis on this question.

At sentencing, the prosecution moved into evidence "all the matters offered during the trial, the evidence particularly with respect to the aggravating circumstances...." (Trial N.T., 5/19/95, at 907). The parties did not present any substantial additional testimony during the penalty phase, so the court instructed the jury to refer to the evidence presented during the guilt phase when making its determination concerning aggravating and mitigating circumstances. During the guilt phase of trial, Rosini elicited the following cross-examination testimony from Dr. Mihalakis:

Q: Is there any way from your examination that you could tell whether the victim was conscious for that half hour [between the beating and the shooting]? In other words, it is possible that the victim, if he had received one of the head

blows or something like that initially, could have been unconscious for that half hour period?

A: I believe that he was indeed conscious and aware what was happening because, (a), as [the prosecution] brought out, we have the gunpowder residue from the hand which would indicate that the hand was raised. And in order to raise a hand in response to something one has to be aware that something is about to happen.

\* \* \*

Q: Is there any way to know if he was unconscious for a period of time before that? In other words, isn't is possible that he was unconscious and if somebody tried to smother him or something this would have caused a reaction?

A: Yes, I—I—I believe I can answer that, sir. I don't believe he was unconscious. The only reason why I say that is I have a fairly broad experience with about thirty or so of forensic—rather medical practice, and, you know, two injuries to the head are not necessarily equivalent to knocking somebody out, (a), because—and there's a reason for this. And that has to do with the brains [sic] capacity to compensate.

(Trial N.T., 5/12/95, at 199–201). Through this line of questioning, Rosini attempted to establish the possibility that Dumchock was not conscious at the time he was shot through the eye, which would militate against the aggravating circumstance of torture. Rosini testified at the PCRA hearing that his cross-examination of Dr. Mihalakis was designed to elicit a response that Dumchock could have been dead when he was shot, providing an alternate reason why Dumchock's eyes were open. (PCRA N.T., 1/24/00—1/27/00, at 234–235). We find that Rosini effectively cross-examined Dr. Mihalakis on the torture aggravating circumstance and, accordingly, Marinelli has failed to prove that Rosini rendered ineffective assistance of counsel in this regard.

### Allegedly Exculpatory Evidence

12. Is Marinelli entitled to a new trial and should his death sentence be vacated because of errors under *Brady v.*

*Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny?

Marinelli asserts three separate violations of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in which the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. Marinelli contends that the prosecution: (1) failed to disclose to him the details of a deal between the Commonwealth and prosecution witness Nathan Reigle (Reigle); (2) failed to provide him with mitigating information concerning his upbringing; and (3) impermissibly instructed Mark to provide the jury with materially false information and withheld impeachment information about Mark. Marinelli alleges that he did not become aware of these supposed *Brady* violations until after this Court affirmed his death sentence.

In *Brady,* counsel for Brady had requested that the prosecution allow him to review extra-judicial statements of Boblit, a co-conspirator of Brady, whom Brady contended had done the actual killing. The prosecution turned over several of Boblit's statements, but failed to show Brady's counsel a statement in which Boblit admitted the actual homicide. Neither Brady nor his counsel had notice of this information until after he had been tried, convicted, sentenced, and received direct review. In a post-conviction procedure filed in the Maryland courts, Brady sought a new trial. On appeal from the denial of his request for collateral relief, the Maryland Court of Appeals remanded the case for a new sentencing hearing because "suppression of the evidence by the prosecution denied [Brady] due process of law . . . ." *Id.* at 85, 83 S.Ct. 1194.[18] The United States Supreme Court granted *certiorari* and affirmed the decision of the Maryland Court of Appeals,

18. The Maryland Court of Appeals did not remand the case for a new trial on the issue of guilt because even if "Boblit's withheld confession had been before the jury, nothing in it could have reduced [Brady's] offense below murder in the first degree." *Brady v. State,* 226 Md. 422, 174 A.2d 167, 171 (1961).

reasoning that "[a] prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate [the defendant] or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice...." *Brady,* 373 U.S. at 87–88, 83 S.Ct. 1194.

"[T]here is an obligation of counsel to make a specific request for exculpatory evidence. If the request is not specific, then the evidence must clearly be material in order for the Commonwealth to be required to disclose it." *Commonwealth v. Moose,* 529 Pa. 218, 602 A.2d 1265, 1272 (1992). "The test of materiality in a case like *Brady* in which specific information has been requested by the defense is not necessarily the same as in a case in which no such request has been made." *United States v. Agurs,* 427 U.S. 97, 106, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Where the reque; a specific one, the materiality test is whether the evidence "might have affected the outcome of the trial." *Id.* at 104, 96 S.Ct. 2392. "Where the request is general, rather than specific ... evidence is material 'if the omitted evidence creates a reasonable doubt that did not otherwise exist.'" *Moose,* 602 A.2d at 1272 (quoting *Agurs,* 427 U.S. at 112, 96 S.Ct. 2392); *accord Commonwealth v. Johnson,* 556 Pa. 216, 727 A.2d 1089, 1094 (1999), *cert. denied,* 528 U.S. 1163, 120 S.Ct. 1180, 145 L.Ed.2d 1087 (2000).

Marinelli's first claim, that the prosecution failed to disclose the terms of a deal between the Commonwealth and Reigle, is really an assertion that "the Commonwealth failed to disclose impeachment evidence regarding ... Reigle." (Brief of Marinelli, at 81). Marinelli cites to the PCRA testimony of Robert Sacavage (now Judge Sacavage),[19] the prosecutor assigned to his case, who testified that he "shaked" Reigle.

19. In November of 1995, after the trial in this case, the voters of Northumberland County elected Mr. Sacavage Judge of the Northumberland County Court of Common Pleas. Out of respect for that position, we will refer to him throughout this Opinion as Judge Sacavage.

Judge Sacavage explained that "[w]hen you're talking to individuals that are mostly strangers to you, you want to make sure you're getting accurate information; and you warn them, certainly, that you expect them to tell the truth." (PCRA N.T., 1/24/00—1/27/00, at 358-360). As the PCRA court properly determined, this does not demonstrate the existence of a deal between Reigle and the Commonwealth and does not constitute evidence that might have affected the outcome of the trial. Accordingly, Marinelli has failed to prove a *Brady* violation in this regard. Moreover, we substantially addressed this contention on direct appeal, where we noted the following:

Nathan Reigle's juvenile record was disclosed by the trial court to counsel for both defendants, including the fact that Reigle was currently on juvenile probation. Further, Reigle's juvenile probationary status and possible bias or agreements with the prosecution were brought out at trial by the Commonwealth. There is thus no merit to [Marinelli's] contention that he was denied an opportunity to confront the prosecution's witness.

*Marinelli*, 690 A.2d at 218.

 Next, Marinelli submits that the Commonwealth failed to provide him with mitigating information concerning his own upbringing. Specifically, Marinelli asserts that Robert Sacavage (now Judge Sacavage), the prosecutor assigned to his case, was aware that Marinelli had a "horrific" childhood because the prosecutor had .had dealings with Marinelli's stepmother, Charlotte Marinelli (Charlotte), seven years before Marinelli's trial, and had then attempted to get Charlotte committed. Marinelli alleges that Judge Sacavage intentionally misled the jury about the childhood of Marinelli.

When questioned by counsel for Marinelli at the PCRA hearing, Judge Sacavage testified as follows:

Q: Okay. When you made that argument to the jury that was sitting over here, and you told them that, "Mr. Marinelli had a rough childhood, that he came from a broken home, the Commonwealth submits to you that on the last point there are millions of Americans that come from broken

homes these days, and it doesn't necessarily equate to someone committing a very serious crime." Judge, when you made that argument you were aware that Mr. Marinelli not only came from a broken home, he came from a home where there was a psychotic individual that was attempting to kill people; were you not?

A: When did he live in this—I don't—it is difficult to answer that. Are you referring to Charlotte Marinelli? ... Charlotte Marinelli was a stepmother of Mr. Marinelli.... I have no idea when Mr. Marinelli resided in that household. In fact, I don't recall Kevin Marinelli residing in that household at the time that we were involved with Charlotte Marinelli.... At the time we were involved with Charlotte Marinelli, there were no matters pertaining to Kevin Marinelli. That was—there was no real reference to that at all. We were investigating an arson case in Atlas.

Q: Okay. And let me just sharpen this so perhaps I can make the relevance clear. You make an argument in front of a jury that my client merely comes from a broken home. When you made that argument, you knew that it is not merely a broken home, it is a home where there is a step mom that is attempting to burn down houses, poison her husband, poison other neighbors and attempting to kill her husband. You knew these things; didn't you?

A: You are entirely wrong, I believe. And I would say that you are wrong because Kevin Marinelli probably was grown by that time. I think Kevin's mother lived in Shamokin. Joseph and Charlotte lived in Atlas. I don't see your connection there.... And with regard to those words that I spoke, trying to equate that with Charlotte Marinelli, you are totally off base. The comment there was simply that if Joseph Marinelli would have been married and then remarried, it is a broken home. I mean, and it says what it says. There are millions of Americans that come from broken homes, and they don't end up killing people.

Q: So that if you are in possession of information in your files, in your records, which goes to sentencing, which is mitigating in sentencing, you are telling me that I'm the one

that is off base if you don't disclose that? Is that what you're telling me?

A: I'm telling you I don't know what relationship Kevin Marinelli had with Charlotte Marinelli, if any. And if there is something in some report in this whole case that references that, show it to me. [Whereupon PCRA counsel for Marinelli showed Sacavage the letter dated September 9, 1988.] [20]

* * *

Q: So that I'm clear, Judge Sacavage, at the time that you tried the penalty phase in Mr. Kevin Marinelli's case you thought that Charlotte Marinelli had absolutely no connection with the man you were trying, who had the same last name; do I have that right?

A: What I thought and what information I had are two different things. One, I didn't think it because I had no information to connect Charlotte with Kevin, except that Charlotte was the second wife of Joseph Marinelli.

(PCRA N.T., 1/24/00—1/27/00, at 370–373, 380). This testimony reflects that Judge Sacavage was not aware that Charlotte and Marinelli resided together, nor did he connect his September 1988 dealings with Charlotte in any way to Marinelli.[21] We do not find it unreasonable that Judge Sacavage failed to turn over this letter that he had no way of connecting to the case against Marinelli. Moreover, Marinelli has not met his burden of proving a Brady violation pursuant to the test set forth in *Agurs* and *Moose*, which requires one claiming a Brady violation following a general request for exculpatory information to show that "the omitted evidence creates a reasonable doubt that did not otherwise exist." *Moose*, 602 A.2d at 1272 (quoting *Agurs*, 427 U.S. at 112, 96 S.Ct. 2392). The PCRA court properly rejected this allegation of error.

**20.** The letter to which Marinelli refers was sent by Judge Sacavage to Geisinger Medical Center in September of 1998, asking that facility to reconsider its decision not to commit Charlotte.

**21.** As the Commonwealth notes, "[n]owhere in the letter is it mentioned about the marital state of Charlotte Marinelli, to whom she was married and with whom she was residing." (Brief of Commonwealth, at 36).

Marinelli's final *Brady* contention is that Judge Sacavage impermissibly instructed Mark to provide the jury with materially false information and withheld impeachment information about Mark. Mark testified before the PCRA court that Judge Sacavage and other members of the prosecution team instructed him to lie to the jury. However, during the course of his testimony, Mark invoked his Fifth Amendment privilege not to incriminate himself and the PCRA court ordered his testimony stricken. Without Mark's testimony that he was told to perjure himself by the prosecution and in light of the testimony of Judge Sacavage that he in no way asked or told Mark to alter his testimony, we cannot find that Judge Sacavage impermissibly instructed Mark to perjure himself before the trial jury.

We now turn to the prosecution's alleged failure to disclose material impeachment evidence concerning Mark. "[I]n order to be entitled to a new trial for failure to disclose evidence affecting a witness' credibility, the defendant must demonstrate that the reliability of the witness may well be determinative of his guilt or innocence." *Johnson*, 727 A.2d at 1094 (citing *Commonwealth v. Morales*, 549 Pa. 400, 701 A.2d 516, 523 (1997)). Marinelli takes the position that the prosecution should have turned over to him information concerning Mark's state of intoxication at the time of the offense. Marinelli posits that he would rely on this information to demonstrate that he was in fact "quite intoxicated" at the time of the offense. (Brief of Marinelli, at 87). However, this allegation, even if proven, does not meet his burden of demonstrating that Mark's reliability was determinative of his guilt or innocence. Given the overwhelming evidence of Marinelli's guilt, including his confession, and the testimony of Dr. Kelsey, discussed *infra*, that Marinelli could control his actions at the time of the murder, (PCRA N.T., 1/24/00—1/27/00, at 258–263), the actions of the Commonwealth in allegedly withholding impeachment evidence do not rise to the level of a *Brady* violation. The PCRA court did not err in concluding that Marinelli failed to demonstrate a violation of due process.

*Counsel's Alleged Failure to Present Mitigating Evidence*

13. Was counsel ineffective at capital sentencing?

Marinelli finally contends that he is entitled to a new penalty phase hearing because trial counsel, Rosini, was ineffective for failing to investigate, develop, and present significant mitigating evidence: (1) that Marinelli was abused and neglected as a child; and (2) that Marinelli suffered significant mental impairments. Marinelli specifically alleges that Rosini should have looked into: (1) the alcoholism of his parents and the resultant abuse his father inflicted upon him and his siblings; (2) his mother's frequent lengthy periods of abandonment of the family; (3) the separation of his parents; (4) the mental illness, violence, and homicidal tendencies of his stepmother; (5) her subsequent suicide; (6) the debilitating psychological effects of all of these events on Marinelli; and (7) his pattern of substance abuse.

When questioned by PCRA counsel for Marinelli at the PCRA hearing, Rosini testified as follows:

Q: Can you tell me, do you recall, what, if any, action you took to try and prepare a penalty phase? And I'm talking pretrial now. Do you remember efforts you undertook to prepare for a penalty phase should you have to reach that?

A: The only thing we did was discuss it with Kevin, who basically instructed us he did not want his family or anything involved.

\* \* \*

Q: When Mr. Marinelli told you, don't call my family, did you undertake to try to explain to him the mitigating factors under the Pennsylvania Capital Sentencing Statute? Did you try to go through those?

A: Verbatim, probably not. In substance, yes.

Q: When Mr. Marinelli told you that don't—stay away from my family, did you attempt to do anything else with respect to the family members?

\* \* \*

A: We had talked to, at the very least, the brother; and ultimately did get him on the witness stand.

\* \* \*

Q: Just so I—so that it is clear, was Mr. Marinelli drawing a line with the family, and he didn't want those people called, but he would have allowed others, other than family, or could you explain that?

A: He really wasn't cooperative in giving us any information concerning a penalty phase.

Q: I'm sorry. I don't know—Mr. Marinelli was not cooperative in giving you information?

A: Correct. He was not really—I don't know how to describe this. It was sort of, it was like he sort of didn't really want to think about that phase or defend that phase or whatever.

Q: Do you recall whether or not, Mr. Rosini, that—I need to ask you some questions about the conversations that you had with Mr. Marinelli vis-à-vis, the penalty phase. Do you know whether or not you turned to Mr. Marinelli and said, Kevin, if we don't put on any evidence in the penalty phase, based on Pennsylvania law—are you familiar with the decision of Bleistone [sic] versus Commonwealth?

A: The specific decision, no, I'm familiar with what the law was at that time.

Q: Would you agree with me that the law, at the time that Mr. Marinelli's case in 1995, was that if the Commonwealth establishes an aggravating factor and the defense fails to establish mitigating factors, that the actual sentencing instruction says the sentence shall be death?

A: Yes.

Q: Did you explain that to Mr. Marinelli?

A: I did explain the situation with aggravating and mitigating circumstances, yes.

Q: Did you explain to him that the Commonwealth, as [the prosecutor] argued to the jury in the penalty phase of the Commonwealth's presentation of guilt and innocence, had established a homicide in the course of a felony that under

Pennsylvania law, that was an aggravating factor that he had already established that based on the guilt-innocence conviction?

A: Did I say it in those words, or did I say it after the verdict? I'm not sure. I know that we had discussed the aggravating circumstances which were filed by the District Attorney's Office including the felony issue, the weapons issue, the torture issue, etcetera, at various times.

\* \* \*

Q: What efforts did defense make with respect to trying to understand Mr. Marinelli's background and history?

A: What I can tell you is we talked to a number of people and the impression that I got, from those various people and from the information we had, was that through his early years and up through high school, etcetera, that he was an extremely intelligent young man. He was, in fact, well behaved, well liked and involved with school, involved with everything. He went to the military. And what ever happened, no one knew. But from that point on, got involved in the socialist party, etcetera, and was a completely different [person] than he had been earlier in his life, and the person he had been.

(PCRA N.T., 1/24/00—1/27/00, at 204–209, 218). This testimony clearly demonstrates .that Rosini attempted to develop background information on Marinelli in the hopes of presenting that information to the jury should a penalty phase have become necessary; however, Marinelli thwarted these efforts by being uncooperative in response to counsel's questions and forbidding Rosini from discussing Marinelli's background with Marinelli's mother.

We have held that a defendant "is not entitled to a new trial where trial counsel acceded to [the defendant's] wishes and refrained from presenting evidence of mitigating factors when it was [the defendant] himself who prevented the presentation of any mitigating factors." *Commonwealth v. Blystone*, 555 Pa. 565, 725 A.2d 1197, 1205–1206 (1999); *accord Commonwealth v. Cross*, 535 Pa. 38, 634 A.2d 173, 176 (1993), *cert.*

*denied,* 513 U.S. 833, 115 S.Ct. 109, 130 L.Ed.2d 56 (1994) (counsel cannot override what the client considers to be in his best interest). We reasoned that if "this Court were to allow an ineffectiveness claim to succeed after appellant made a knowing, intelligent and voluntary waiver of his right to present mitigating evidence, it would have the unwanted and absurd effect of allowing appellant and other defendants to build automatic ineffective assistance claims into their case in order to guarantee themselves a new sentencing hearing should they receive the death penalty." *Blystone,* 725 A.2d at 1206.

Moreover, Rosini testified at the PCRA hearing that his impression of other witnesses who knew Marinelli as a child contradicted the testimony of Marinelli and his family presented at the PCRA hearing that he suffered marked childhood trauma. In preparation for trial, Rosini had learned some limited information about Marinelli's upbringing. As indicated above, Rosini testified that, according to the persons to whom he spoke, through the conclusion of high school, Marinelli was an intelligent, well-behaved, well liked young man who was involved with school. On cross-examination before the PCRA court, the Commonwealth asked Rosini whether, "as part of your trial strategy, did you believe that attempts to bring in any evidence relative to a poor childhood could have a negative effect on a jury?" (PCRA N.T., 1/24/00—1/27/00, at 269). Rosini responded "I didn't think it was something that would be accepted as a mitigating factor in this case." *Id.* Thus, Marinelli has failed to meet his burden of proving that Rosini lacked a reasonable strategic basis for failing to present evidence of his allegedly tumultuous upbringing.

 Marinelli's contention that Rosini was ineffective for failing to present evidence of Marinelli's psychological impairments likewise fails. Rosini retained the services of a psychologist, one Dr. Kelsey. After examining Marinelli, Dr. Kelsey concluded that Marinelli could distinguish right from wrong, did not suffer from any mental illness, and was able to control his actions at the time of the murder. (PCRA N.T., 1/24/00—1/27/00, at 258–263). The doctor further concluded that Mari-

nelli had engaged in some degree of preparation and planning in anticipation of the murder. *Id.* at 261. Based on the information gleaned from his interview with Marinelli, Dr. Kelsey informed Rosini that Marinelli would be able to assist in the preparation of his defense. *Id.* at 260. Thus, pursuant to the report of Dr. Kelsey, Marinelli did not suffer from any psychological impairments. Rosini reasonably relied on Dr. Kelsey's report and, accordingly, did not present a mental health mitigating circumstance. Counsel will not be deemed ineffective for failing to raise a meritless claim. *Tilley,* 566 Pa. 312, 780 A.2d 649.

Marinelli also avers that trial counsel was ineffective for failing to present evidence of his substance abuse as a mitigating circumstance during the penalty phase. Marinelli contends that Rosini should have presented evidence of Marinelli's intoxication at the time of the murder as a mitigating circumstance pursuant to 42 Pa.C.S. § 9711(e)(3) (that Marinelli could not appreciate the criminality of his conduct or conform his conduct to the requirements of law at the time) and Marinelli's general substance abuse problem as a mitigating circumstance pursuant to 42 Pa.C.S. § 9711(e)(8) (the catchall provision). Marinelli points to his admission to Dr. Kelsey that he had been drinking a case a day of whiskey or beer for an extended period of time. However, in Dr. Kelsey's report to Rosini, Dr. Kelsey indicated there was evidence only of mild intoxication. (PCRA N.T., 1/24/00—1/27/00, at 259–260).

The standard for proof of a voluntary intoxication as a mitigating circumstance pursuant to 42 Pa.C.S. § 9711(e)(3) is as follows: "[f]or a charge to have been given on intoxication, the evidence would have to show that the Appellant was overwhelmed or overpowered by alcohol to the point of losing his faculties so as to be incapable of forming a specific intent to kill." *Commonwealth v. Carpenter,* 533 Pa. 40, 617 A.2d 1263, 1268 (1992) (standard applicable to claims of voluntary intoxication in both the guilt phase and the penalty phase). On direct appeal, we held that "[a]lthough there was testimony

of alcohol consumption prior to the killing in this matter, there was no evidence that [Marinelli] was overwhelmed or overpowered by alcohol. This evidence, thus, did not meet the requisite standard for the court to instruct the jury as to the effect of voluntary intoxication on the degree of murder." *Marinelli*, 690 A.2d at 221. As we have already determined that Marinelli was not overwhelmed or overpowered by alcohol at the time of the killing, the evidence was insufficient to warrant presentation to the penalty phase jury of a voluntary intoxication mitigating circumstance.

 As to Marinelli's claim of a substance abuse problem, because of Marinelli's lack of cooperation and refusal to permit Rosini to interview his family members, the only information available to Rosini at the time of the penalty phase hearing was the report of Dr. Kelsey, which indicated that there was evidence of mild intoxication but also stated that Marinelli did not suffer from any psychological impairment and could exercise unhindered self-control and judgment. Thus, it reasonably appeared to Rosini that Dr. Kelsey did not believe that Marinelli suffered from a substance abuse problem; Dr. Rosini found evidence of mild intoxication. As more fully discussed above, we will not deem counsel ineffective for failing to raise a claim that the defendant prevents counsel from discovering. *Blystone.*

Accordingly, Marinelli has failed to meet his burden of proving that Rosini was ineffective in failing to present the above-described allegedly mitigating evidence to the penalty phase jury.

## CONCLUSION

We affirm the decision of the PCRA court dismissing claims nine and ten and denying relief on claims eleven through thirteen, as articulated herein. However, because we have determined that the PCRA court improperly summarily dismissed claims one through eight, we remand the matter to the PCRA court so that it can fully and fairly consider those allegations of error.

658

## *ORDER*

PER CURIAM:

**AND NOW**, this 25th day of November, 2002, the Petition for Writ of Habeas Corpus is **DENIED**.

Justice SAYLOR files a concurring opinion.

Justice NIGRO concurs in the result only.

Justice SAYLOR concurring.

I concur in the result and write to Appellant's issues 9, 11, and 13.

**Claim 9—asserted *Bruton* violation**—I agree with the majority that Appellant's claim under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), was previously litigated. I also believe that the statutory previous litigation doctrine constitutes a reasonable limitation in relation to state *habeas corpus* jurisprudence. For these reasons, I am constrained to abide by the Court's prior ruling on this issue.

**Claim 11—asserted ineffective assistance of counsel for failing to object to testimony of the Commonwealth's forensic pathologist**—I disagree with the majority's reasoning concerning Appellant's claim of ineffective assistance of trial counsel based on his failure to object to certain opinion testimony from the Commonwealth's forensic pathologist, Dr. Mihalakis. In particular, my difference with the majority relates to Dr. Mihalakis's opinion, predicated on the position of spent firearm shell casings, as to Appellant's location at the time that he shot the victim. The majority acknowledges that Appellant's claim in this regard may have arguable merit (as the testimony was outside the area of expertise for which Dr. Mihalakis was qualified), but reasons that counsel pursued a reasonable strategy in acceding to the admission of the evidence, since Appellant's location at the time of the killing was irrelevant to the defense strategy. This conclusion, however, does not comport with the trial record.

Appellant offered no testimony or evidence in his own defense at the guilt phase of trial. Rather, as reflected in trial counsel's closing statement, his defense was predicated largely on a statement that he had given to police after the killing in which he admitted his involvement, but claimed to have acted under compulsion from his brother, Mark Marinelli. *See* N.T., May 8–19, 1995, at 744–54 (defense counsel guilt phase closing speech). Specifically, Appellant claimed that he and his brother were standing inside the doorway of a particular bedroom on the upper floor of the victim's house when: Mark Marinelli instructed Appellant to kill the victim; Appellant refused; Mark Marinelli produced a gun, pointed it at Appellant, and threatened to kill him if he did not comply; and Appellant, feeling threatened, walked from the bedroom to a position approximately five feet from the victim and fired the fatal shots. *See* N.T., May 8–19, 1995, at 633–36. Counsel also relied upon Appellant's statement as a basis for suggesting that the victim may already have been dead at the time Appellant shot him. *See id.* at 751–51. The aim of the defense was for the jury to credit this statement (or at least for a reasonable doubt to arise by its account), thereby militating against a finding of the culpability necessary to support a verdict of first-degree murder.

In anticipation of such strategy, the Commonwealth offered, *inter alia,* the testimony, quoted by the majority, in which Dr. Mihalakis opined, based upon the position of spent shell casings, that Appellant had been in the hallway where the victim was killed in a different physical position (on the other side of and closer to the victim) than Appellant related in his statement to police. *See* Majority Opinion, at 1268. The intent and effect of this testimony was to undermine Appellant's statement and, correspondingly, the foundation for his defense. *See* N.T., May 8–19, 1995, at 831 (prosecutor's guilt-phase closing) (arguing, in rebuttal to Appellant's version of events, "[a]nd there is no explanation whatsoever [under Appellant's theory of the case] why the casing should be over here[;] Dr. Mihalakis says you can't believe that[;][t]hat is impossible"). While trial counsel may have suggested in the

post-conviction proceedings that Dr. Mihalakis' testimony was consistent with the defense theory of the case, he obviously was of a different mind as of trial, when he argued:

Spent cartridges, again, consistent with Kevin Marinelli's statement; but *make absolutely no sense in the Commonwealth's theory of this case,* that the spent cartridges are out in the hallway, and Kevin Marinelli says he was in the bedroom.

\* \* \*

Again, the spent cartridges; if the person was out in the hallway, was firing a semiautomatic gun that ejects automatically from the right, how does a spent cartridge get on this side of the body under the body? It can't. It had to have happened as Kevin Marinelli said.

N.T., May 8–19, 1995, at 747 (defense counsel guilt-phase closing) (emphasis added). The majority is correct that the defense strategy was to "mitigate [Appellant's] involvement" in the killing; however, it misses the point that Dr. Mihalakis's opinion was offered precisely to establish the aggravated degree of Appellant's participation. I therefore cannot agree with the majority's reasonable strategy assessment.

I would hold, however, that Appellant has failed to establish the necessary prejudice regarding this claim, since Dr. Mihalakis's stray opinion testimony was sufficiently cumulative of substantial, properly admitted evidence. For example, testimony concerning Appellant's proximity to the victim at the time of the killing based on an examination of one of the gunshot wounds substantially undermined Appellant's version of the encounter, *see, e.g.,* N.T., May 8–19, 1995, at 184 (direct examination of Dr. Mihalakis) (describing a wound to the victim's head as "near contact"), as did other evidence. Thus, while a closer question might be presented, in my mind, had this claim arisen as one entailing trial error subject to harmless error review, I agree with the majority's ultimate conclusion that no relief is due at the post-conviction stage.

Additionally, in rejecting Appellant's claim of ineffective assistance of counsel for failing to produce a defense expert to

rebut Dr. Mihalakis, the majority relies on the same conclusion that the defense theory of the case at trial was consistent with the Commonwealth's expert evidence. I therefore disagree with the majority's (and the PCRA court's) finding of reasonable basis in relation to this claim for the reasons stated above. Again, while trial counsel attempted to reconcile the physical evidence with his theory of the case, it cannot reasonably be disputed that Dr. Mihalakis's conclusions concerning the import of the physical evidence were antagonistic to the defense. Further, the defense strategy in the attempt to reconcile the Commonwealth's evidence with Appellant's own self-inculpatory statement, characterized by shifting and spreading of blame and rendered out of the presence of the jury, was a weak one, particularly in light of the inherent unreliability of such statements. Finally, I disagree with the majority that defense counsel's re-elicitation of a Commonwealth witness's direct testimony constitutes such effective cross-examination as would obviate the call for contrary defense evidence. *See* Majority Opinion at 1270 (quoting cross-examination of Dr. Mihalakis).

Nevertheless, regardless of the appropriate decision concerning the reasonable strategy prong of the ineffectiveness test, I would find no relief due on the prejudice prong of the inquiry. The expert testimony offered by Appellant at the PCRA hearing, if believed, might bring into question the scientific validity of particular conclusions by Dr. Mihalakis, *see* N.T., Jan. 27, 2000, at 439–49, thus fostering some potential for doubt concerning the weight that should be accorded those specific opinions. But, since it does nothing to affirmatively support Appellant's theory of the case, which was presented to the jury only indirectly (via Appellant's statement to police as related during the Commonwealth's case) and in argument and was contradicted by other evidence not addressed by Appellant's post-conviction expert, it is not sufficient, in my view, to create the requisite controversy regarding the reliability of the verdict to support an award of post-conviction relief.

Claim 13—asserted ineffective assistance of counsel in the penalty phase—I have previously expressed my view that, in the performance of their obligation to conduct a reasonable penalty-phase investigation, counsel in capital litigation faced with a recalcitrant client should not merely appear at the penalty proceeding and present little or no evidence, but rather, should bring the matter to the attention of the common pleas court at the earliest opportunity to enlist the court's direction and assistance. *See Commonwealth v. Michael,* 562 Pa. 356, 375–78 & n. 1, 755 A.2d 1274, 1284–86 & n. 1 (2001) (Saylor, J., dissenting). A majority of the Court, however, has deemed the failure to do so an insufficient ground to support an award of post-conviction relief. *See, e.g., id.*