70 A.3d 777

**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Robert Gene REGA, Appellant.**

Supreme Court of Pennsylvania.

Submitted Sept. 5, 2012.

Decided June 17, 2013.

642

644

Hunter Stuart Labovitz, Esq., Defender Association of Philadelphia, Eric John Montroy, Esq., Federal Community Defender Office, Eastern District of PA, David M. Osborne, Esq., Federal Public Defender's Office, for Robert Gene Rega.

Amy Zapp, Esq., PA Office of Attorney General, Harrisburg, Jeffrey D. Burkett, Esq., for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, JJ.

## *OPINION*

Justice SAYLOR.

This is a capital post-conviction appeal.

In December 2000, Appellant conspired with others to perpetrate a robbery at the Gateway Lodge in Cooksburg, Jefferson County. In the course of this and other crimes, Appellant shot and killed the night watchman, Christopher Lauth.

Appellant was convicted of first-degree murder and other offenses and sentenced to death in 2002. After a lengthy post-sentence motions process, relief was denied, and Appellant's judgment of sentence was affirmed on direct appeal. *See Commonwealth v. Rega*, 593 Pa. 659, 933 A.2d 997 (2007), *cert. denied*, 552 U.S. 1316, 128 S.Ct. 1879, 170 L.Ed.2d 755 (2008).[1] Appellant acted *pro se* to initiate litigation under the Post

---

1. The underlying factual circumstances are discussed in detail in the decision on direct appeal. *See Rega*, 593 Pa. at 670–79, 933 A.2d at 1003–09.

Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546 (the "PCRA"), and, following several procedural turns, a counseled, amended petition was filed. After conducting a series of evidentiary hearings, the PCRA court denied relief.

The present appeal followed, in which Appellant advances eleven claims. In our review, we consider whether the post-conviction court's findings are supported by the record and are free from legal error. *See, e.g., Commonwealth v. Lesko,* 609 Pa. 128, 152, 15 A.3d 345, 358 (2011).[2]

## Claim I

■ First, Appellant contends that he was denied due process and deprived of effective confrontation, because the Commonwealth failed to disclose alleged verbal understandings with prosecution witnesses who were co-perpetrators in the robbery and/or its planning. Centrally, Appellant relies on the United States Supreme Court's seminal decisions in *Brady v. Maryland,* 373 U.S. 83, 87–88, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963) (holding that due process is offended when the prosecution withholds favorable evidence from an accused that would tend to exculpate him or reduce the penalty imposed), *Giglio v. United States,* 405 U.S. 150, 155, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (extending the *Brady* rule to embrace certain impeaching evidence, including that which might demonstrate witness bias), and *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) (explaining that a conviction obtained by the State through the

**2.** The general, multi-tiered requirements of the PCRA and for litigating claims of deficient attorney stewardship have been discussed in detail in many other opinions of this Court. The recent decision in *Commonwealth v. Sepulveda,* 618 Pa. 262, 55 A.3d 1108 (2012), for example, serves as a convenient reference for the governing principles. *See id.* at 277–78, 55 A.3d at 1117–18.

To the extent that we do not discuss all applicable requisites to relief in our treatment of any particular claim, it is because the aspect in focus is dispositive of overarching and/or derivative claims. *See generally Commonwealth v. Gibson,* 597 Pa. 402, 420, 951 A.2d 1110, 1120–21 (2008). To the degree any underlying claim is not directly available for review, our assessment of it here is employed solely as a means of determining the viability of extant derivative claims. *See, e.g., id.* (explaining that a derivative claim cannot be sustained where an underlying one is unmeritorious).

knowing use of false evidence—or upon the prosecution's failure to correct unsolicited evidence known to be false—violates the Fourteenth Amendment).

Factually, however, the post-conviction court determined that, at all relevant times, the district attorney enforced a policy that plea agreements would be neither offered nor negotiated with witnesses charged with crimes until their cooperation was fully realized. *See Commonwealth v. Rega*, Nos. CP–33–CR–26–2001, *et al., slip op.* at 20 (C.P. Jefferson Oct. 27, 2011). This finding is supported by substantial evidence of record. *See, e.g.,* N.T., Dec. 14, 2009, at 138 (reflecting testimony of a defense attorney that "it's [the district attorney's] established policy that he will not make a deal or offer a specific plea bargain until time to do so."), 145 (elaborating that the relevant time for plea offers, per the district attorney's policy, is after the witness's cooperation is completed). The court also inferred from the evidence presented that any suggestion of "possible verbal agreement[s]" derived from defense attorneys' and witnesses' own hopeful predictions, rather than from actual incentives offered by the district attorney. *See Rega*, Nos. CP–33–CR–26–2001, *et al., slip op.* at 21. We agree with the court that this inference is a reasonable one deriving from evidence concerning the district attorney's practices.

While Appellant references conflicting evidence and evidence from which contrary inferences might be gleaned, *see, e.g.,* Brief for Appellant at 15, the relevant review at this stage is limited to an examination of the record to determine whether the material findings of the post-conviction court are supported by it. *See, e.g., Lesko,* 609 Pa. at 152, 15 A.3d at 358. Accordingly, we decline Appellant's invitation, in effect, to reweigh differing portions of the post-conviction evidence. As reflected above, the record plainly supports the PCRA court's finding of no agreements or incentives, other than maintaining the possibility for later negotiation based on the witnesses' cooperation.[3]

3. Certainly, Appellant's attorneys were well aware of this incentive, as they questioned various of the Commonwealth's witness about their

■ Appellant also advances a second claim styled as a *Brady* violation, in that the prosecutor apparently did not advise Appellant's trial attorneys that one prosecution witness, Susan Jones, suffered from a health condition causing some degree of memory impairment. The post-conviction court, however, determined that such failure did not meet the materiality requirement requisite to relief on a *Brady* claim, *see United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985), in that an exploration by the defense of the memory impairment concern at trial would not have created a reasonable probability of a different outcome. *See Rega*, Nos. CP–33–CR–26–2001, *et al.*, *slip op.* at 25–26. The court explained, *inter alia*, that Jones was able to recall significant details at trial which were consistent with her previous statements to law enforcement authorities and that the Commonwealth presented a wealth of other incriminating evidence at trial—including the testimony of three direct co-participants in the Gateway Lodge incursion. *See id.* at 26–27.[4] Upon review, we find that the PCRA court's materiality determination is supported by the record and free from legal error.

## Claim II

Appellant next asserts that the prosecution was able to adduce damaging evidence secured from a search of his mother's home, because his trial counsel failed to raise meritorious objections.

desires for leniency in their own criminal cases. *See, e.g.*, N.T., June 18, 2002, at 172–73.

4. Additionally, as the Commonwealth observes, the witness did allude to her health condition at trial in response to the prosecutor's questions directed at her failure to recall specific details. *See* N.T., June 15, 2002, at 212. This lends some credence, at least, to the Commonwealth's suggestion that the pervasive focus of Appellant's trial attorneys during Jones's cross-examination (which rested on their successful efforts to stress that Jones had repeatedly lied to law enforcement officials) was strategic. Indeed, the Commonwealth also points to post-conviction evidence suggesting that Appellant likely knew of Jones's medical condition prior to his trial. *See* N.T., Dec. 17, 2009, at 160–67.

Appellant explains that, while a prisoner in a state correctional institute awaiting trial, he spoke to his mother, Joan Rega, by telephone. Pursuant to prison protocols, the conversation was audiotaped, and the tapes were secured by law enforcement officials and gave rise to the challenged search warrant. The affidavit of probable cause prepared by an investigating trooper detailed efforts on the part of Appellant to enlist his mother in a jury-tampering scheme impacting his trial.[5] Appellant relates that, based on this affidavit, a district magistrate issued a search warrant authorizing troopers to search Joan Rega's home for "Jefferson County Jury Questionnaires, Jury List and any or all papers, documents containing names of prospective jurors for [Appellant's] pending criminal case[.]" Search Warrant, June 7, 2002, at 1.

5. Specifically, the trooper attested as follows:

[Tape recorded conversations] show quite clearly that Joan REGA has received juror list information containing names of prospective jurors. Furthermore, said conversations show that she has disseminated this information to other friends and family members and acquaintances. The conversation on May 30, 2002, shows Joan REGA saying that "[E.E.'s] sister-in-law[,]" [J.T.,] is on the panel. It also shows that Joan is examining the list of juror names and is marking the list as she consults with others.... Then, in the June 2, 2002 conversation, Robert REGA asks Joan REGA if "without saying anything, what did Gram [a/k/a E.E.] say, will she do it, yes or no." In Joan REGA's reply to that question, she states that [E.E.] is willing to talk to [J.T.], but that she just needs to know what questions to ask her about being on "Robert's jury." Robert REGA then silences his mother and severely reprimands her because she "never thinks before she talks." He is quite angry at her and he obviously knows he is being tape-recorded.

It was determined that [E.E.] ... is the grandmother of Renee REGA, the spouse of Robert REGA. [E.E.] was subsequently interviewed ... on June 6, 2002, and she advised that Joan REGA had, in fact, come to her house on Saturday, June 1, 2002, and admitted that Joan REGA had discussed the fact that [J.T.] was, in fact, on the jury panel. She identified this sister-in-law and proposed juror as [J.T.], whose name is found on the list of proposed jurors for June 11, 2002. She also stated that she had heard that Robert REGA had chastised his mother about the talk.

There is probable cause to believe that juror questionnaires/lists, etc. will be found in [Joan Rega's] mobile home and that there will be markings identifying the targeted juror(s).

Affidavit of Probable Cause I, June 7, 2002, at 1–2.

Appellant highlights that, upon execution of the search warrant, no jury-related documents were found; however, while reviewing materials in the mobile home, troopers observed other incriminating documents. As related in an ensuing, second affidavit of probable cause:

A handwritten letter on a legal sized yellow paper was found written by Robert Gene REGA. The contents of the letter indicate that Robert G. REGA requested that Joan REGA att[em]pt to find a person without a criminal record to provide him with an alibi for the night of December 21, 2000, the night of the LAUTH homicide. Robert REGA indicated he would pay the witness $500 for his testimony and the letter contains specific details as to what the witness would testify to.

Affidavit of Probable Cause II, June 7, 2002, at 1. This affidavit was employed as the basis to secure a second search warrant, which yielded incriminating evidence used against Appellant at trial to demonstrate his consciousness of guilt. *See* N.T., Jury Selection, June 19, 2002, at 172–86; N.T., June 20, 2002, at 190–93 & Exs. C–68–C–77.

█ Appellant recognizes that his trial counsel pursued suppression, *see* N.T., June 13, 2002, at 3–5; however, he criticizes the attorneys for failing to assert a violation of *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978) (holding that, where a defendant demonstrates that an affiant in a warrant affidavit made a false statement knowingly and intentionally, or with reckless disregard for the truth, the search warrant must be voided, unless the affidavit's remaining content is sufficient to establish probable cause). In this argument, Appellant explains that one of the tape-recorded conversations evidenced that Joan Rega had agreed to send the marked juror lists back to Appellant some seven days before the affidavit of probable cause was signed. It is Appellant's position that the omission of this information from the affidavit of probable cause "violated *Franks*," and that evidence tainted by the violation should be suppressed. Brief for Appellant at 20.

The Commonwealth acknowledges that trial counsel did not invoke *Franks* in their suppression efforts. It observes, however, that counsel did advance the argument that nothing in the tape recorded conversations suggested that juror questionnaires would be found in the trailer. *See* N.T., Jury Selection, June 13, 2002, at 3–5. Moreover, the Commonwealth relies on the following rationale of this Court from Appellant's direct appeal, applied in passing upon a related issue:

Appellant had received the jury questionnaires, and the recorded phone conversations with his mother indicated that he had passed them on to her and that she had, in turn, distributed them to friends and family. As the trial court found in rejecting Appellant's contention that the search warrant was unconstitutionally broad, *common sense dictated that in the process, Ms. Rega easily could have copied some of that information onto other papers and documents besides the official lists and questionnaires.*

*Rega,* 593 Pa. at 686, 933 A.2d at 1012 (emphasis added).[6]

Based on such reasoning, it is the Commonwealth's position that this Court "has already validated the trial court's common sense assertion that there was probable cause to believe that other papers and documents containing the names of jurors would be found in the home during the search." Brief for the Commonwealth at 44; *accord Rega,* Nos. CP–33–CR–26–2001, *et al., slip op.* at 4 ("Whether or not [the affiant trooper] should have understood the [taped conversation] to mean that the actual list [Appellant] sent to his mother would no longer be found at the trailer, ... the information he had was sufficient to warrant a search for 'other papers and documents besides the official lists and questionnaires' onto which Joan [Rega] may have copied juror information.").

6. According to Appellant, any inference that Joan Rega had copied information amounts to "pure speculation." Brief for Appellant at 20. To the contrary, the Commonwealth established probable cause, through Joan Rega's own words, that she had been enlisted to aid Appellant in very serious misconduct aimed at undermining the justice system. We remain of the view that there is enough to suggest, more likely than not, that documentary evidence of such crime would be found in her residence.

We agree with the Commonwealth and the PCRA court that the dispositive rationale on direct appeal sufficiently resolves the present *Franks*-based claim and that no relief is due on it. *See supra* note 6 and accompanying text.[7]

Appellant further challenges his trial attorneys' stewardship relative to the scope of the first search of his mother's trailer. He explains that the incriminating documents troopers saw in that search—and which were invoked as the basis to establish probable cause for the second search—pre-dated the creation of juror lists for Appellant's trial. According to Appellant, therefore, troopers executing the first warrant lacked any lawful basis for reviewing such documents. In response to the PCRA court's explanation that there is no proof that the troopers were aware of the dates of documents as they looked for juror references, *see Rega*, Nos. CP–33–CR–26–2001, *et al.*, *slip op.* at 4–5, it is Appellant's position that such rationale "strains credulity and is not reasonable." Brief for Appellant at 21.

The Commonwealth again turns to the direct appellate review, emphasizing that, in considering an analogous argument (*i.e.*, that troopers could not justify opening small envelopes because they could not contain bulky juror lists and questionnaires), this Court reasoned as follows:

... a lawful search generally extends to the entire area in which the object of the search may be found.

... the warrant properly authorized a search for papers and documents containing the names of prospective jurors. These documents could conceivably be one page documents. In fact, the only way the executing officers could determine whether a particular piece of paper contained the names of prospective jurors was to look at it. Accordingly, after properly scanning the letters and reaching the conclusion that they were not relevant to the crime of jury tampering,

---

7. The Commonwealth also observes that *Franks*, on its face, contemplates willful or reckless falsehoods, but that Appellant's claim appears to rest on an asserted omission. *See* Brief for the Commonwealth at 42 n.26. Given our disposition, above, we need not presently consider the import of this observation.

the police officers stopped further search of these documents, and obtained a second search warrant, specifically authorizing them to look for papers related to the separate crime of witness tampering. There was nothing improper in this course of action.

*Rega,* 593 Pa. at 686–88, 933 A.2d at 1013–14 (footnote omitted). Moreover, the Commonwealth relates that there is no Pennsylvania decisional law standing for the proposition that law enforcement officials cannot look at documentary evidence when they are in a position to be reviewing such papers in the course of a lawful and valid search.

■ Appellant does not discuss any authority in support of this latter line of his argument. There is no question that citizens generally enjoy protection, under the Fourth Amendment, from general, exploratory searches by government actors. *See United States v. Khanani,* 502 F.3d 1281, 1289 (11th Cir.2007) (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 2038–39, 29 L.Ed.2d 564 (1971)). The United States Supreme Court has both recognized that, "[i]n searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized," *Andresen v. Maryland,* 427 U.S. 463, 482 n. 11, 96 S.Ct. 2737, 2749 n. 11, 49 L.Ed.2d 627 (1976), and cautioned that "responsible officials ... must take care to assure that [searches] are conducted in a manner that minimizes unwarranted intrusions upon privacy," *id.*

■ Here, however, nothing in Appellant's presentation persuades us that law enforcement personnel must commence the initial cursory review upon execution of a search warrant for documents by focusing exclusively upon date entries. Indeed, in many instances there will be other aspects of papers which may draw more immediate attention in the screening process. Furthermore, Appellant cites no evidence that the troopers' review was not reasonably and responsibly directed, in the first instance, toward the determination of whether the subject papers were within the scope of the search authoriza-

tion. Accordingly, Appellant has failed to establish a basis for relief from his judgment of sentence.

## Claim III

Next, Appellant claims that he was denied due process, the presumption of innocence, and effective assistance of counsel when the trial court directed a deputy sheriff dressed in plain clothes to sit at the defense table during trial. Appellant asserts that the trial court made no record of the need for this arrangement, and there was no evidence that he had threatened his counsel or anyone else in the courtroom. As a result, Appellant contends, his ability to communicate freely and openly with counsel during trial was chilled, and jurors were susceptible to the suggestion that Appellant was dangerous.

 Appellant, however, does not address the PCRA court's explanation that the deputy sheriff "was brought in because of security concerns, including [Appellant's] apparent indifference to whether others got hurt or died during an escape attempt and potential threats against members of the jury and his own attorneys." *Rega*, Nos. CP33–CR–26–2001, *et al.*, *slip op.* at 13.[8] The court also observed that Appellant

8. In terms of the assertion of a suggestion of dangerousness, there is a well-developed line of judicial decisions reflecting trial courts' discretionary authority to implement security measures, even where these carry some measure of potential prejudice, when required to further an essential state interest. *See, e.g.*, *Hellum v. Warden, U.S. Penitentiary–Leavenworth*, 28 F.3d 903, 907–08 (8th Cir.1994). The United States Supreme Court has explained that courts "have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for alleged criminal conduct." *Holbrook v. Flynn*, 475 U.S. 560, 567, 106 S.Ct. 1340, 1345, 89 L.Ed.2d 525 (1986). While Appellant now contends that there was no evidence of a relevant threat in the first instance, both of his trial attorneys testified, on post-conviction, that they had been apprised of a letter Appellant had written to his mother in which he proposed a violent escape attempt. *See* N.T., Dec. 15, 2009, at 138–39; N.T., Jan. 19, 2010, at 229–30. Although Appellant seems to imply that there was no specific risk relative to the courtroom setting, in the exercise of its discretion, the trial court was not obliged to believe that Appellant's proclivity toward violence would be limited to the one specific avenue which had already been uncovered. In short, Appellant's presentation fails to establish an abuse of discretion on the trial court's part in the relevant regards.

was asked at trial whether he had any issues with the deputy sheriff's presence, and he said that he did not. *See id.* at 14 (citing N.T., June 14, 2002, at 5). Furthermore, the court referenced post-conviction testimony from one of Appellant's trial lawyers indicating that the deputy sheriff's presence did not, in fact, chill the attorney-client communications. *See id.* at 13–14 (quoting N.T., Dec. 15, 2009, at 305). Finally, the PCRA court highlighted that, although Appellant submitted an affidavit in support of his petition indicating that communications were curtailed, he elected not to testify in the post-conviction hearings and, thus, failed to create a creditable evidentiary record in support of his proffer.

For these reasons, we agree with the PCRA court that Appellant has failed to establish either that his communications with his attorneys were impacted, or that the trial court abused its discretion in the form of the increased security fashioned to address Appellant's expressed proclivity toward violence in response to his criminal prosecution for first-degree murder and attendant restraints on his liberty. *See supra* note 8.

## Claim IV

Appellant argues that he was denied a public trial and effective assistance of counsel, based on the allegation that the trial court conducted after-hours trial sessions on two occasions when the courthouse doors were locked. Because his trial counsel did not object to such trial arrangements, Appellant alleges deficient stewardship. He invokes *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), *Presley v. Georgia,* 558 U.S. 209, 130 S.Ct. 721, 175 L.Ed.2d 675 (2010), and *Commonwealth v. Contakos,* 499 Pa. 340, 453 A.2d 578 (1982), in support of his position that courts must take every reasonable step to accommodate public attendance. Furthermore, according to Appellant, the asserted error is structural and, therefore, not subject to a prejudice requirement. *See generally Sullivan v. Louisiana,* 508 U.S. 275, 281–82, 113 S.Ct. 2078, 2082–83, 124 L.Ed.2d 182 (1993) (ex-

plaining that harmless-error review does not pertain relative to structural errors).

According to the Commonwealth, review of the record makes it "anything but clear" that the courthouse was ever truly closed, and there is no evidence that a single person was ever denied access during Appellant's trial. Brief for the Commonwealth at 45–47. The Commonwealth also explains that all of the decisions upon which Appellant relies entail circumstances in which it is indisputable that access to proceedings had been denied to citizens. *See, e.g., Contakos,* 499 Pa. at 343, 453 A.2d at 579.

■ Consistent with Appellant's arguments, various courts have found a violation of the right to a public trial to be in the nature of a structural error. *See, e.g., Owens v. United States,* 483 F.3d 48, 63 (1st Cir.2007). It is well recognized, however, that such violation is a particular type of structural error which is waivable. *See, e.g., Peretz v. United States,* 501 U.S. 923, 936, 111 S.Ct. 2661, 2666, 115 L.Ed.2d 808 (1991) (citing *Levine v. United States,* 362 U.S. 610, 619, 80 S.Ct. 1038, 1044, 4 L.Ed.2d 989 (1960), for the proposition that "failure to object to closing of courtroom is [a] waiver of [the] right to [a] public trial").[9] Since Appellant did not object to the after-hours courtroom arrangements, the only cognizable aspect of his claim is that of deficient stewardship, as to which he must establish prejudice. *See Sepulveda,* 618 Pa. at 277–79, 55 A.3d at 1117–18.

■ The only fact-based argument Appellant offers concerning the prejudice component of the ineffectiveness inquiry is as follows:

On the Saturday that the courthouse was closed, Sue Jones, a key Commonwealth witness, testified falsely and misleadingly that she had no deal with the prosecution and had not been told how she would be treated in her pending criminal

9. It is beyond the scope of this opinion to consider whether and to what extent other forms of structural error may be subject to issue preservation requirements. *See generally Commonwealth v. Martin,* 607 Pa. 165, 218, 5 A.3d 177, 208–09 (2010) (Saylor, J., concurring) (commenting that there appears to be a division of authority on this subject).

cases. *See* Claim I. Thus, the salutary purpose of conducting public trials was lost when Sue Jones testified while the courthouse was closed, undermining confidence in the fairness of [Appellant's] trial.

Brief for Appellant at 27. As discussed, however, the PCRA court found as a fact, supported by creditable evidence, that the Commonwealth did not enter into any agreements with its witnesses prior to or during Appellant's trial. In any event, in line with the Commonwealth's position, Appellant has failed to demonstrate that there were not spectators in the courtroom in the Saturday session, that any spectators were turned away from the courthouse, or that the presence or absence of a certain number of spectators had any impact whatsoever on Jones's testimony. *Accord* Brief for the Commonwealth at 47 (observing that Appellant "did not produce a single witness who testified that they were turned away and not able to watch [Appellant's] trial at any point in time"). For these reasons, the post-conviction court did not err in denying relief on this claim.

### Claim V

Appellant next asserts that one of his trial attorneys labored under a conflict of interest, because he had previously represented a Commonwealth witness in a separate criminal theft prosecution. Appellant claims that this prosecution witness was an important one, because she was an employee of the Gateway Lodge, she had alerted state police that they should investigate Appellant, and she provided testimony supporting the Commonwealth's contention that Appellant was the leader in his relationship with a co-perpetrator. *See* Brief for Appellant at 29. Appellant complains that his trial counsel never cross-examined the witness about her criminal case and associated motivation to curry favor with the prosecution. *See id.* at 29–30.

The Commonwealth relies on the PCRA court's explanation that the relevant trial attorney did not remember that he had previously represented the witness at the time he cross-examined her at trial. *See Rega,* Nos. CP–33–CR–26–2001, *et*

*al., slip op.* at 17–18. Furthermore, the Commonwealth explains, the witness was not convicted of a crime in connection with the salient representation but, rather, received an accelerated rehabilitation disposition ("ARD"). *See generally* Pa. R.Crim.P. Ch. 3. Thus, the Commonwealth questions both the permissibility and potential efficacy of cross-examination on the subject in any event. *See, e.g., Commonwealth v. Brown,* 449 Pa.Super. 346, 354, 673 A.2d 975, 979 (1996), *cited affirmatively in Whalen v. Penn., DOT,* 613 Pa. 64, 71, 32 A.3d 677, 681 (2011).

■ Given the caseloads experienced by public defenders and other criminal-law attorneys, the scenario in which a defense attorney forgets that he previously represented a prosecution witness in a different case is not as uncommon as would be desired. *See, e.g., State v. Murrell,* 362 N.C. 375, 665 S.E.2d 61, 81 (2008). Here, the PCRA court's supported findings are that counsel did not remember the previous representation prior to the cross-examination, that he adequately raised issues concerning the witness's credibility, and that exploration of the witness's previous experience with the criminal justice system, even if permissible, would not have impacted the outcome of Appellant's trial. Accordingly, the court did not err in denying relief on this claim.

### Claim VI

Next, Appellant claims that his trial counsel were ineffective, because they failed to impeach key Commonwealth witnesses concerning open criminal charges and concomitant incentive to curry favor with the government, habitual drug use, and memory condition (for Susan Jones). *See* Brief for Appellant at 31–32.

■ In his brief discussion of this claim, Appellant fails to acknowledge that a fair amount of the information he claims was available to trial counsel to develop by way of cross-examination was disclosed to the jury on the Commonwealth's direct examination or otherwise. For example, the jurors knew very well that various key Commonwealth witnesses

were subject to open charges. *See, e.g.,* N.T., June 18, 2002, at 135–36 (reflecting testimony from prosecution witness Shawn Bair that he presently lives at Jefferson County prison, he had criminal charges on the trial list, and he understood he was a co-defendant and his testimony against Appellant could also be used against him). Moreover, trial counsel capitalized, extensively, on such evidence. For example, in his closing remarks, counsel explained:

> I am going to talk a little bit about Susan Jones, Stan Jones, Shawn Bair and Ray Fishel.... When you look at their testimony, the first thing you do is [consider whether] they have any interest in the outcome of this case? Now, each one, I submit to you, has an interest in the outcome of this case. What I mean by that is, each one wants to please the Commonwealth with the testimony that they have offered today. When the time comes these defendants are obviously thinking I want the Commonwealth to give me a favorable plea agreement or treat me in an otherwise favorable way. The witnesses were obviously thinking two things; I can please the Commonwealth by offering this testimony, but I can also implicate and put the blame for these events on Robert Rega. They have an obvious interest in this case, and to suggest otherwise I suggest to you is absurd.

N.T., June 20, 2002, at 150–51; *see also id.* at 152–68 (referencing trial counsel's discussion of the relevant Commonwealth witnesses as "co-defendants" and accomplices, in terms of the seriousness of the charges facing them, *e.g.,* felony murder, and in terms of their desire to "curry favor with the Commonwealth").

Lacking such context, Appellant's discussion of this claim is, at the very least, misleading. At most, the argument provides insufficient basis to negate the postconviction court's central rationale supporting the denial of relief on the claim, as follows:

> By the time [the relevant witnesses] stepped down from the witness stand ..., the jurors understood that they were unsavory characters not averse to lying to the authorities or engaging in other criminal acts.... Additional knowledge of

their criminal activity or learning that Jones suffered from occasional memory problems would not have likely changed [the] outcome, especially when the witnesses' testimony was consistent in all material respects.

*Rega,* Nos. CP–33–CR–26–2001, *et al., slip op.* at 38.

## Claim VII

Appellant claims that his trial counsel were ineffective for failing to proffer an expert witness to rebut the Commonwealth's proofs to the effect that Mr. Lauth was killed while on his knees and shot from behind and close in. *See* N.T., June 14, 2002, at 33–34 (reflecting such testimony of a medical examiner). Appellant's post-conviction expert testified that Mr. Lauth was, in fact, shot while lying on the floor, that it could not be shown that he was shot from behind, and that he was shot from at least 36 inches away. *See* N.T., Dec. 17, 2009, at 32, 37, 46–47, 51. According to Appellant, had his trial counsel offered the post-conviction evidence to the jury, he could have demonstrated that the victim may not have been conscious at the time he was killed and, thus, he was not murdered in as cold-blooded a fashion as the Commonwealth made out. Appellant also suggests, without much concrete development, that his postconviction evidence implicates another co-perpetrator in the robbery as the shooter more than it does Appellant. *See* Brief for Appellant at 36 (claiming that one of the co-perpetrators admitted to standing in the vicinity of the position in which Appellant's post-conviction evidence suggests the shooter stood).

In response, the PCRA court explained that trial counsel pursued a reasonable strategy, insisted upon by their client, of attempting to establish that he simply was not present at Gateway Lodge during the robbery-homicide. *See Rega,* Nos. CP–33–CR26–2001, *et al., slip op.* at 27–28. In this regard, the court credited counsel's testimony that it would have diluted this defense to suggest to the jury, "please find my client not guilty, but if you think that he did it don't find that he did it a certain way." *Id.* at 28 (quoting from the post-conviction testimony of one of Appellant's trial attorneys).

In terms of the cold-bloodedness of the killing of Mr. Lauth, whether he was on his knees or prone, his precise distance from the shooter, and the degree of his mobility are not factors which materially alter the appraisal. Notably, trial counsel conceded that Mr. Lauth was killed in cold blood, *see* N.T., June 20, 2002, at 174, apparently because the point was not worth arguing and to maintain counsel's credibility with the jury. Even if the PCRA court had credited Appellant's post-conviction evidence, which it did not, we do not envision that the difference between whether Mr. Lauth was killed while on his knees or prone would have made a material difference in the jurors' culpability assessment.

## Claim VIII

Appellant next complains that his trial counsel were ineffective for failing to adequately investigate and present mitigating evidence. Central to his main claim, Appellant challenges this Court's crediting, on direct appeal, of the trial court's finding, on a developed post-sentence record, that Appellant waived his right to have counsel present further mitigating evidence. *See Rega,* 593 Pa. at 709, 933 A.2d at 1026. Appellant points to various portions of the post-conviction record which, he asserts, undermine this conclusion. *See* Brief for Appellant at 39–62. In connection with this claim, Appellant also develops a line of argument asserting that trial counsel failed adequately to rebut the Commonwealth's evidence of aggravation, in particular, evidence that a series of burglaries and trespasses committed by Appellant qualified as violent felonies for purposes of the aggravating circumstance entailing a significant history of prior felonies involving the use or threat of violence to the person. *See* 42 Pa.C.S. § 9711(d)(9). Further, he challenges the stewardship of his counsel on direct appeal for failing to adduce the evidence presented at post-conviction, in particular, evidence suggesting that Appellant did not waive mitigation.

A principal difficulty with Appellant's claim is that he fails to frame his argument in terms of the applicable standard of review, *i.e.,* whether the PCRA court's findings are supported

by the record and free from error. *See, e.g., Lesko,* 609 Pa. at 152, 15 A.3d at 358. Indeed, although that court made extensive findings and conclusion, citing to the post-conviction record, Appellant's approach is to ignore the PCRA court's treatment, and to simply draw from evidence and inferences which support his position.

Although the PCRA court deemed this claim previously litigated, *see Rega,* Nos. CP–33–CR–26–2001, *et al., slip op.* at 49, the court specifically evaluated the postconviction record nonetheless, and its discussion includes the following recitation:

> The Court acknowledges that there existed prior to trial a wealth of information that could have been utilized as mitigation evidence at the penalty hearing. Even without their client's participation, trial counsel could have interviewed family and friends, obtained school, medical, and other institutional records, and consulted experts who could have evaluated those sources.... They likewise could have more fully ascertained the nature and circumstances of the offenses underlying the (d)(9) aggravating circumstance had they obtained copies of the records pertinent to their client's earlier convictions. While what they could have done might be relevant in a different case, however, what trial counsel actually did was reasonable, non-prejudicial, and thus not ineffective under the circumstances.
>
> [Counsel] were well aware that mitigation-type evidence was out there and had considered personally investigating or having their private investigator look into what mitigation evidence existed. Though their understanding of their client's history was limited, for instance, they knew he had endured what [one attorney] described as a "brutal" upbringing and that they could obtain records, talk with people who knew the defendant, and prepare and present a mitigation defense without his help. From the outset, however, [Appellant] had repeatedly instructed them to spend their time and resources working on the guilt phase, not the penalty phase. It made no difference when counsel explained what mitigation meant or what types of information

could be presented, either; [Appellant] was adamant that he would not submit to any sort of psychological assessment and that his attorneys were not to investigate his past or inquire into his mental health. (PCRA 12/15/2009, pp. 195–96, 201–03, 219–20, 234–39, 259–60; *id.*, 01/19/2010, pp. 117, 120–22, 124–25, 148–61; 163–65, 167, 177–78, 187–91, 203–05, 242–43, 253, 264–65).

\* \* \*

It was not a matter of the attorneys misinterpreting their client's wishes and him acquiescing to their developed strategy, either. Rather, as [counsel] testified, [Appellant] had a strong personality, was very involved with his defense, never hesitated to opine about any topic or what direction the case should go, and always made it clear when he did or did not want them to do something.

\* \* \*

Despite their client's express wishes, though, trial counsel did assemble a brief mitigation defense they believed might be effective. Even that, however, was without [Appellant's] cooperation or approval. According to [one of the attorneys], the defendant seemed to be upset that they had even gone as far as they did to introduce personal mitigation evidence.

\* \* \*

The record is ... replete with evidence supporting trial counsels' testimony, and the Court explicitly finds, that from the start of their representation, the defendant had specifically directed [his attorneys] to focus all their efforts on obtaining an acquittal and leave penalty phase investigation and preparation alone. That being the case, [Appellant] cannot succeed upon his claim that counsel were ineffective in handling all penalty phase issues, because the law will not force an unwilling defendant to pursue a mitigation defense or demand that trial counsel overrule his decision.

*Rega,* Nos. CP–33–CR–26–2001, *et al., slip op.* at 49–54 (footnotes omitted).[10]

There is no question that there are indicia on the post-conviction record, just as there were in the post-sentence record, of a modesty in relevant training and experience on the part of Appellant's counsel, and of various missteps on their part as well.[11] It is also not reasonably subject to debate, however, that various aspects of the evidence in the post-conviction record were in conflict and, thus, that Appellant is presently obliged to address the present findings of the PCRA court on their terms. *See, e.g., Lesko,* 609 Pa. at 152, 15 A.3d at 358.[12]

**10.** *See also id.* at 52–53 (developing that the testimony of Appellant's counsel on direct appeal corroborated trial counsels' averments that Appellant directed them not to pursue mitigation); *id.* at 53 (referencing a letter written by Appellant to the trial judge indicating, *inter alia,* that "One who is innocent, does not Mitigate why he did not commit the act.").

**11.** It cannot reasonably be disputed, for example, that counsel should have reviewed files from the criminal convictions which the Commonwealth offered in support of the aggravating circumstance involving a significant history of prior crimes entailing the use or threat of violence. *See Rompilla v. Beard,* 545 U.S. 374, 377, 125 S.Ct. 2456, 2460, 162 L.Ed.2d 360 (2005) (holding that, "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial").

**12.** A specific example of Appellant's failure in this regard is his repeated references to his post-conviction Exhibit 45, a letter from one of the trial attorneys to Appellant which he contends establishes his own willingness to pursue mitigation. *See* Brief for Appellant at 59–60. In this regard, Appellant simply ignores the PCRA court's specific discussion of such exhibit, in juxtaposition to the balance of the post-conviction record, as follows:

Defendant's Exhibit 45 does not diminish the strength of the evidence supporting [the finding that he had directed his trial attorneys to "leave penalty phase investigation and preparation alone"]. As of May 7, 2002, Rega was apparently considering some type of mitigation defense. As [his counsel] testified, however, that was not their last conversation about the issue. (PCRA, 12–15–2002, pp. 248–49). [Direct-appeal counsel], moreover, when explaining the apparent disparity between Rega's refusals to cooperate and his actual cooperation, testified, "Something I—I concluded after reading the trial transcript and listening to the tapes and several meetings in person

■ There are instances in which a post-conviction petitioner may obtain a review of a claim previously rejected on direct appeal, for example, by pursuing derivative claims of deficient stewardship in the presentation of the claim. On the other hand, we have explained that, where this Court's reasoning and holding on direct appeal encompass the claim sought to be raised on collateral review, and where there is no irrefutable, manifest error in the disposition, the previous litigation doctrine will be applied. *See Commonwealth v. Uderra*, 580 Pa. 492, 524, 862 A.2d 74, 93–94 (2004). Without addressing the post-conviction court's determination on its terms—which are entirely supportive of this Court's disposition on direct appeal—Appellant cannot establish the type of error necessary to overcome the previous litigation doctrine relative to the controlling reasoning and holding of this Court on direct appeal.[13] Accordingly, we credit the position of the PCRA court and the Commonwealth that this claim is previously litigated. *See* 42 Pa.C.S. § 9543(a)(3) (rendering a petitioner ineligible for post-conviction relief on a claim which has been previously litigated).[14]

with [Appellant], he doesn't mind making inconsistent statements, one to one person, one to another. I found a lot of inconsistency in the things that [he] said, whether that's because of mood or whatever" (*Id.* 05/21/2010, pp. 17–18). That he was once entertaining the possibility of a mitigation defense thus does not substantiate his claim, particularly in the face of so much countervailing evidence. *Rega*, Nos. CP–33–CR–26–2001, *et al.*, *slip op.* at 54 n.24. As related above, our own review confirms that there is a conflicting post-conviction record. Thus, the importance of proceeding under the appropriate standard of review to address the PCRA court's various reconciliations and credibility judgments is manifest.

13. In terms of the application of this Court's previous holding on direct appeal that Appellant waived mitigation in relevant part, we observe that the United States Supreme Court has determined that, in such circumstances, a lawyer's failure to undertake an otherwise adequate mitigation investigation will not be deemed prejudicial. *See Schriro v. Landrigan*, 550 U.S. 465, 475, 127 S.Ct. 1933, 1941, 167 L.Ed.2d 836 (2007).

14. This author believes that, when confronted with a client who is not cooperating in critical aspects of trial preparation in a capital case, trial counsel has an obligation to apprise the trial court at the earliest opportunity to enlist the court's direction and assistance. *See, e.g., Commonwealth v. Marinelli*, 570 Pa. 622, 662, 810 A.2d 1257, 1280

## Claim IX

█ In Appellant's ninth claim, he raises a challenge to the applicability of the aggravating circumstance involving a significant history of violent felonies, *see* 42 Pa.C.S. § 9711(d)(9), based on the contention that it should not subsume "nonviolent" burglaries or instances of criminal trespass. Appellant recognizes that his line of argument has been rejected by this Court on many previous occasions, but he requests reconsideration and, in the alternative, seeks to preserve the claim for federal review. *See* Brief for Appellant at 63 n.31. Again, we decline to serially reconsider the precedent in this area.

█ Appellant appends a brief *ex post facto* argument to this claim, contending that at the time of his convictions, he had no notice that they might be used as aggravating circumstances in a death case. *See id.* at 64. In our view, the relevant time for purposes of a proper *ex post facto* analysis is the time Appellant murdered Mr. Lauth.[15] At such time, the case law was settled in the relevant regard and, accordingly, there was ample notice available to Appellant that his previous criminal acts might be used as evidence of aggravation for first-degree murder should he perpetrate such a killing, *see*

(2002) (Saylor, J., concurring). Majority support has not been garnered, however, to require such appraisal and enlistment. *See, e.g., Commonwealth v. Bomar*, 573 Pa. 426, 474 & n. 19, 826 A.2d 831, 860 & n. 19 (2003). It should be noted, nevertheless, that this Court has indicated that a trial court which has been apprised of a mitigation waiver should conduct a colloquy to confirm that such waiver is knowing, voluntary, and intelligent. *See, e.g., Commonwealth v. Randolph*, 582 Pa. 576, 585, 873 A.2d 1277, 1282 (2005) Appellant, however, has not challenged the absence of such a colloquy in his case.

**15.** *Accord United States v. Pitera*, 795 F.Supp. 546, 563–64 (E.D.N.Y. 1992) (explaining that use, in aggravation, of convictions predating passage of a statute under which the death penalty was pursued did not violate the Ex Post Facto Clause, because consideration of those crimes neither exposed the defendant to conviction for criminal conduct of which he was not given fair notice nor subjected him to further punishment for earlier crimes); *cf. United States v. Hardeman*, 704 F.3d 1266, 1268 (9th Cir.2013) (explaining that the United States "Supreme Court has long held that recidivism statutes do not violate the Ex Post Facto Clause because the enhanced penalty punishes only the latest crime and is not retrospective additional punishment for the original crimes").

*Commonwealth v. King,* 554 Pa. 331, 369–70, 721 A.2d 763, 782–83 (1998), as Appellant proceeded to do.

## Claim X

Next, Appellant contends that the trial court improperly failed to specifically instruct the jury that the aggravating circumstance for killing in the perpetration of a felony, *see* 42 Pa.C.S. § 9711(d)(6), does not apply to one who did not actually perpetrate the underlying murder, but who is merely the killer's accomplice. In this regard, Appellant refers to this Court's decision in *Commonwealth v. Lassiter,* 554 Pa. 586, 595, 722 A.2d 657, 662 (1998) (plurality) (explaining that the in-perpetration-of-a-felony aggravator does not extend to mere accomplices to a murder, who did not actually perpetrate the killing).

*Lassiter* brings into question imprecise jury instructions in which trial courts have phrased the in-perpetration-of-a-felony aggravator in the passive voice, for example, by indicating that the aggravator applies whenever the "killing was committed in perpetration of a felony." *See Commonwealth v. Markman,* 591 Pa. 249, 292, 916 A.2d 586, 612 (2007). However, where, as here, the trial court's instruction tracks the language of the statute—advising jurors that the aggravator applies when *"the defendant* committed a killing while in the perpetration of a felony," N.T., June 21, 2002, at 120 (emphasis added), the court has "conveyed the essential information in an understandable form." *Markman,* 591 Pa. at 292, 916 A.2d at 612.

Presumably because the trial court in Appellant's case correctly instructed the jurors as to the (d)(6) aggravator, he invokes *Lassiter* more obliquely, by claiming that the prosecutor misadvised the jurors through his assertion that the evidence presented at the guilt phase (and incorporated into the sentencing proceeding) required the jury to find the (d)(6) aggravator. In this regard, Appellant highlights that the trial court previously had issued an accomplice-liability charge at the guilt phase, and, thus, it was possible that Appellant might

have been convicted of first-degree murder as an accomplice. To bolster the contention that this might have been the case, Appellant observes that he adduced evidence that another co-perpetrator of the Gateway Lodge robbery—Stanford Jones—had sent a letter to the prosecutor attempting to take sole responsibility for the robbery and killing, albeit both before and after this statement, Jones had identified Appellant as the killer. *See* N.T., June 20, 2002, at 5–46.[16] Under Appellant's theory, the prosecutor was wrong to suggest that the conviction for first-degree murder established that *Appellant* himself perpetrated the killing.

As the Commonwealth relates, however, its theory of the case for first-degree murder consistently was that Appellant was the leader of the co-perpetrators of the Gateway Lodge robbery, that he alone shot and killed the victim, and that he was thus the principal actor in the capital crime. *See, e.g.,* N.T., June 20, 2002, at 182, 184, 195, 218 (reflecting various passages from the prosecutor's closing remarks at the guilty phase of trial). That the jury was authorized to find Appellant guilty as an accomplice to various crimes even if jurors did not fully credit the Commonwealth's evidence did not undermine the prosecutor's ability to rely on its own guilt-phase theory and evidence, which he reasonably believed the jury had credited through its verdicts.[17]

In our view, in addressing the sentencing jury, the prosecutor was entitled to rely on the strength of the Commonwealth's own case establishing Appellant's perpetration of the

16. At trial, Jones explained that, in fabricating his confession to having been the sole perpetrator, he was attempting to implicate his estranged wife as his accomplice in an effort to have custody of his children transferred to his mother. *See* N.T., June 20, 2002, at 20.

17. Moreover, Stanford Jones's short-lived version that he was the sole actor in the robbery-homicide was irreconcilably inconsistent with Appellant's own self-serving account of the night it occurred. In this account, Appellant conceded that Jones and other of the co-perpetrators planned the robbery together at his trailer and met there again after the robbery-homicide to breach a stolen safe and divide the money found in it. *See Rega,* 593 Pa. at 676, 933 A.2d at 1006–07; *see also* N.T., June 19, 2002, at 135 & Ex. C–66. Appellant merely attempted to persuade the investigating trooper that he did not accompany the group to the Gateway Lodge. *See id.*

killing, and the weakness of Appellant's contrary evidence derived from an indisputably contrived account of the events. As such, we reject Appellant's contention that the prosecutor's association between the first-degree murder conviction and Appellant's actual perpetration of the killing in the argumentation was improper in the first instance. Moreover, we conclude that the trial court's issuance of the appropriate charge requiring the jurors to find that the defendant, *i.e.* Appellant, actually perpetrated the killing to implicate the (d)(6) aggravator is sufficient to ameliorate any uncertainty.

## Claim XI

In his final claim, Appellant asks us to weigh the cumulative prejudicial effect of all errors. Nothing in Appellant's presentation, however, individually or cumulatively, has persuaded us that he is entitled to post-conviction relief.

The order of the PCRA court is AFFIRMED.

Chief Justice CASTILLE, and Justices EAKIN, BAER, TODD, McCAFFERY, join the opinion.