J-S37022-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| TYRONE JOHNSTON | : | |
| | : | |
| Appellant | : | No. 1523 EDA 2017 |

Appeal from the PCRA Order Entered April 21, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0004489-2007

BEFORE: OLSON, J., McLAUGHLIN, J., and STEVENS*, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.: **FILED SEPTEMBER 28, 2018**

Appellant Tyrone Johnston appeals *pro se* from the order denying him relief on his petition filed under the Post Conviction Relief Act, 42 Pa.C.S.A. §§ 9541-9546. Johnston argues that his trial counsel was ineffective, which resulted in his conviction for first-degree murder,[1] and that his PCRA counsel was ineffective for withdrawing from representation before the PCRA court. We affirm.

In the early hours of February 27, 2006, Jamel Conner was shot six times at close range, including twice in the head, and died from his wounds. Law enforcement recovered five shell casings from a nine-millimeter gun from the scene of the shooting. **See** PCRA Court Opinion, filed 9/6/17, at 4.

---

* Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2502(a).

Approximately six weeks later, on May 15, 2006, Stephanie Labance was shot and killed approximately two and a half blocks from the scene of Conner's killing. Like Conner, Labance was shot at close range, and received two gunshot wounds to the head. Law enforcement recovered five shell casings from a nine-millimeter gun from the scene of the shooting. No firearms were recovered from either the Conner or Labance murder scenes. *Id.*

Two and a half weeks after Labance's death, during a routine patrol in the vicinity of the shooting, Philadelphia Police Officer Anna Mae Law stopped Erin Wood and warned her about the recent shooting of Labance. Officer Law was familiar with both Labance and Wood, as both had been heavy drug users working as prostitutes in the neighborhood. Wood told Officer Law that she had information about the shooting. Wood's subsequent statements to the police led to Johnston's arrest for both the Labance and Conner murders. *Id.*

Johnston was charged with each murder separately, and the Commonwealth gave notice of intent to pursue the death penalty. The instant appeal pertains to Johnston's charges related to Conner's murder; Johnston's charges related to Labance's murder proceeded under a separate docket number.[2] The two cases were consolidated for trial before a jury.

At a pre-trial conference, the Commonwealth requested permission to tell the jury that an eyewitness to Conner's death, Paul Chladek, would not be

_____

[2] *See Commonwealth v. Johnston*, 2929 EDA 2013, unpublished memorandum at 4 (Pa.Super. 2015) (identifying trial court docket number for Labance charges as CP-51-CR-0004489-2007, and affirming judgment of sentence for those charges).

- 2 -

testifying because he was deceased. *See* N.T., 2/17/09, at 17-18. The prosecutor stated that Chladek had been murdered with the same handgun used in the murders of Conner and Labance, but that the Commonwealth did not have enough evidence to make an arrest for Chladek's murder.[3] *Id.* at 18. Johnston's attorney[4] agreed that the prosecutor could notify the jury during trial that Chladek was deceased, as long the prosecutor did not tell the jury that Chladek was murdered. *Id.*

In exchange for the Commonwealth's agreement not to pursue the death penalty, Johnston waived his right to a jury trial. *See* N.T., 2/17/09, at 55-57, 62-75. The consolidated bench trial then took place before the same judge who had presided over the pre-trial conference, and who had heard the

---

[3] The prosecutor stated:

> Paul Chladek would seem to be, in the Jamel Conner murder, an important witness. The testimony of the other witnesses will be that he was standing right there when it happened. Paul Chladek was subsequently murdered; actually, by the same firearm, although we're not able to get presented enough evidence [sic] to get an arrest.

> I would be asked to elicit either from a detective or one of the witnesses or by an instruction that Paul Chadlek is now deceased. Simply put, if the jury doesn't understand that Paul Chadlek is deceased, they may be left to wonder why we're not calling him or seeking further information from him or anything of that nature.

N.T., 2/17/09, at 17-18.

[4] Johnston had separate counsel for each case throughout the trial. Both counsel have since died. We refer here to his trial attorney for the instant case.

- 3 -

Commonwealth's statement that Chladek had been murdered by the same firearm as Conner and Labance.

At Johnston's bench trial, Wood testified that she had witnessed Johnston murder Conner and that Paul Chladek was present when Johnston approached Conner. N.T., 2/23/09, 165, 171. Wood said she identified "Paul" for police from a photograph, and the Commonwealth asked her which "Paul" she meant, since Paul Evans, a former friend of Wood's, was also slated to testify. *Id.* at 201. Wood responded, "Not Paul that I lived with. . . . Paul that was murdered." *Id.* Johnston's attorney objected, and the court responded, "I'm sorry. What was it? I don't know if I heard it. You might not want to tell me." *Id.* at 202. Johnston's attorney told the court, "If you didn't hear it, I'm not going to tell you." *Id.* The prosecutor then clarified that Wood had identified for the police a picture of "the Paul that you described earlier as being with [Conner] right before he was shot." *Id.*

The Commonwealth presented the testimony of a second eyewitness to Conner's murder, who identified Johnston, as well as the testimony of three other people who were present during Conner's shooting, but who could not identify Johnston as the shooter. *See* PCRA Ct. Op. at 5-7.

Wood also testified that she later heard Johnston brag about murdering Labance. *Id.* at 5. Paul Evans testified that he remembered hearing Johnston tell Wood that he shot someone at the location of Labance's murder. *See* N.T., 2/25/09, at 187-213.

In addition, the Commonwealth presented Police Officer Leonard Johnson as an expert in "firearms and firearms microscopic comparison of ballistics-related evidence." *Id.* at 11. Prior to Officer Johnson's admission as an expert, Johnston's counsel[5] questioned Officer Johnson on whether he was aware of the rate of error in the identifying the markings on fired cartridge casings. The officer stated that there was a rate of error, but did not state what it was. He instead explained that the service that offers an annual firearms examiner test also provides the annual percentage of those taking the test who successfully matched markings on cartridge casings to a firearm. *Id.* at 10. Officer Johnson's results to the test had never been shown to be erroneous. *Id.* at 10-11.

Officer Johnson then testified that he examined the fired cartridge casings from each of the murder scenes and the microscopic patterns of markings left on them by ejection from a firearm. He said that it was his opinion, within a reasonable degree of certainty, that the cartridges recovered from both scenes had been fired from the same firearm. *Id.* at 31.[6]

_____

[5] While Johnston's counsel for the Labance murder was the one to cross-examine the witness for *voir dire*, we will examine whether Johnston's counsel for the Conner witness was ineffective for failing to make further examinations in light of co-counsel's questioning.

[6] Regarding the bullets retrieved from the murders, the expert opined that it was impossible to discern whether they were fired from the same firearm or not; but the expert testified that the bullets recovered were a compatible size with the type of cartridge casings recovered. N.T., 2/25/09, at 22, 33.

On cross-examination, defense counsel[7] asked him if he was able to determine how old the evidence he tested was. He responded he could not. *Id.* at 34-35. Counsel also had him confirm that there are thousands of nine-millimeter handguns on the streets of Philadelphia. *Id.* at 43. In addition, defense counsel[8] asked if there is a requirement of a minimum number of similar markings between fired shell casings for an examiner to say that the casings came from the same firearm. *Id.* at 37-38. Officer Johnson stated that his opinion was not dependent on a certain number of patterns or markings, and conceded that his opinion was his subjective interpretation of the markings. *Id.* Officer Johnson also testified that he is not aware of any studies that have examined the extent of the uniqueness of markings made on ejected cartridges. *Id.* at 38-39.

After the Commonwealth rested, but before Johnston presented his defense, the court engaged him in a colloquy. Johnston confirmed that he had one witness to offer, Melissa Retford, and that he had not requested any other witnesses or told his attorneys about any other witnesses.[9] At the pre-trial

---

[7] On the Conner case.

[8] On the Labance case. *See* note 5, *supra*.

[9] The relevant portion of the colloquy was as follows:

> THE COURT: And now, sir, are there any witnesses other than the one that [defense counsel on the Conner case] is calling? What's that name?

conference, Johnston's attorney indicated that he would call Retford to testify if he was able to locate her. *See* N.T., 2/17/09, at 4. Johnston's attorney subpoenaed Retford prior to trial, but when she failed to appear for the first day of testimony, Johnston's attorney requested a bench warrant. *See* N.T. 2/23/09, at 107. Johnston's counsel stated that by that time, he had been trying to find Retford for two years, and that he had never interviewed her. He nonetheless stated he intended to call her as a witness based on her written statement to the police. *Id.* at 109-12. Retford's statement to the police was not further discussed at the pre-trial conference, or entered into evidence at trial.

At trial, Retford testified as a witness for the defense that she has known Johnston for approximately five years. N.T., 2/26/09, at 10. Retford testified that on the night of Conner's killing, at some time after midnight, she and Johnston's girlfriend, Kay Maden, drove approximately two blocks down the

_____

[Defense counsel on the Conner case]: Melissa Retford.

THE COURT: Other than her, were there any witnesses that you wanted to call or anything that you discussed about either of your cases with [either defense counsel] that now you see is not going to happen?

THE DEFENDANT: No, no witnesses. That was it, that one. Wasn't no other witness I requested.

THE COURT: Okay. And none other that you told them about?

THE DEFENDANT: No.

N.T., 2/26/09, at 7.

street to Johnston's apartment, and stayed for 45 minutes, using drugs. *Id.* at 10-13, 16, 24-26. Johnston was there, and possibly Johnston's mother, sleeping in her room, although Retford did not see her. *Id.* at 13, 24. Afterwards, she dropped Kay off at her apartment, and when Retford returned home, police were present and had blocked the street. *Id.* at 12, 14-15. Retford testified that she did not hear any gunshots while she was at Johnston's apartment. *Id.* at 24, 25.

The prosecution cross-examined Retford on various topics, including her previous arrests and incarceration, and history of giving false identification to the police, her drug use, her previous romantic relationship and continual contact with Jay, and her failure to come forward sooner in Johnston's defense after he was arrested. *Id.* at 16-22, 31-32, 51-53, 56-57. The Commonwealth questioned her regarding letters she sent from prison, threatening violence toward one of the witnesses to the shooting for assisting police in the case. *Id.* at 41-45, 49. Retford also acknowledged that Jay had tried to send her a copy of another witness's statement, *id.* at 49, and that Kay Maden, who did not testify in Johnston's defense, was in jail at the time of trial. *Id.* at 23.

To rebut Retford's testimony, the Commonwealth had a detective read into the record Johnston's statement to the police. *Id.* at 63-71. Johnston stated that he was at home on the night of Conner's murder, with Kay Maden and his mother, and that he heard gunshots a few hours after midnight. *Id.* at 67. Johnston did not mention Retford in his statement.

The court convicted Johnston of first-degree murder, criminal conspiracy, and possession of an instrument of crime.[10] The court sentenced Johnston to a mandatory term of life imprisonment for first-degree murder, and to lesser sentences on the other charges. Johnston appealed,[11] and we affirmed his judgment of sentence. *See Commonwealth v. Johnston*, 120 A.3d 1059 (Pa.Super. 2015) (unpublished memorandum). The Supreme Court denied allowance of appeal in July 2015. *Commonwealth v. Johnston*, 118 A.3d 1108 (Pa. 2015).

Johnston filed a timely *pro se* PCRA petition on January 7, 2016, which is the subject of the instant appeal. The PCRA court appointed counsel, who later filed a "no merit" letter pursuant to *Commonwealth v. Finley*, 550 A.2d 213 (Pa.Super. 1988), and a motion to withdraw as counsel. After conducting an independent review of Johnston's claims, the PCRA court granted counsel's petition to withdraw and issued a notice of its intention to dismiss the PCRA Petition without a hearing, pursuant to Pa.R.Crim.P. 907. Johnston filed a *pro se* response, arguing the merits of the issues he raised in his PCRA Petition. The PCRA court dismissed the Petition in April 2017 and permitted counsel to withdraw.

---

[10] 18 Pa.C.S.A. §§ 2502(a), 903, and 907(a), respectively.

[11] After we dismissed Johnston's direct appeal for failure to file a brief, the lower court reinstated his direct appeal *nunc pro tunc* in October 2013.

Johnston, proceeding *pro se*, filed a timely notice of appeal, and raises the following issues:

1)    Did the PCRA Court err[] when it denied PCRA relief, when trial counsel was ineffective for calling Melissa Retford as an alibi witness, although a thorough investigation and/or interview with the witness would have revealed that Ms. Retford was not a credible witness?

2)    Did the PCRA court err[] when it denied PCRA relief, when trial counsel was ineffective for failing to hire and, therefore, call a ballistics expert to put the Commonwealth through a meaningful adversarial challenge, challenging the Commonwealth's theory that the same weapon killed both victims?

3)    Did the PCRA court err[] when it denied relief, when trial counsel was ineffective for failing to object to the Commonwealth's reference of an unrelated murder, for which [Johnston] was never charged []?

4)    Was PCRA counsel ineffective for failing to properly review the issues presented in [Johnston]'s PCRA petition and withdrawing from representation, leaving [Johnston] abandoned and without counsel on his first, timely filed PCRA petition?

Johnston's Br. at 4 (holdings below omitted).

"[I]n reviewing the propriety of an order granting or denying PCRA relief, this Court is limited to ascertaining whether the evidence supports the determination of the PCRA court and whether the ruling is free of legal error." ***Commonwealth v. Andrews***, 158 A.3d 1260, 1262-63 (Pa.Super. 2017). A PCRA petitioner will only prevail on a claim that trial counsel was ineffective through pleading and proving each of the following: "(1) the underlying legal claim is of arguable merit; (2) counsel's action or inaction lacked any

objectively reasonable basis designed to effectuate his client's interest; and (3) prejudice, to the effect that there was a reasonable probability of a different outcome if not for counsel's error." ***Commonwealth v. Grove***, 170 A.3d 1127, 1138 (Pa.Super. 2017). A failure to plead or prove any prong will defeat an ineffectiveness claim. ***Id.***

### 1. Retford

Johnston first argues that his trial counsel was ineffective for calling Melissa Retford to testify in his defense. Johnston argues that his trial counsel failed to interview Retford prior to her testimony; discover the issues that would come out on cross-examination, such as Retford's criminal history; and realize on the day of trial that Retford appeared to be under the influence of drugs. According to Johnston, Retford's testimony, that she was at Johnston's apartment with him, his mother, and Maden on the night of the murder, was not credible because neither Maden nor Johnston's mother were called to testify. Johnston also maintains that Retford's testimony conflicted with the statement introduced by the Commonwealth in which Johnston claimed he was with only Maden and his mother, and not Retford, at the time of the shooting. Johnston argues that instead of calling Retford, his counsel should have called his mother or Maden to testify to corroborate his statement, but alleges that his trial counsel advised him that his mother would be unbelievable, and that Maden was unavailable. Johnston asserts that Maden

was in fact incarcerated at the time of his trial, and available to testify. Johnston's Br. at 13-18.

The PCRA court concluded that Johnston's argument lacked merit, because Johnson had been questioned in open court on his decision to call Retford and not to call any other witnesses. *See* PCRA Ct. Op. at 8-10. We agree.[12]

"While in some cases it may be preferable for a trial court to conduct a hearing . . . to determine the strategy applied, a defendant who makes a knowing, voluntary, and intelligent decision concerning trial strategy will not later be heard to complain that trial counsel was ineffective on the basis of that decision." *Commonwealth v. Paddy*, 800 A.2d 294, 316 (Pa. 2002) (citation omitted). "To hold otherwise would allow a defendant to build into his case a ready-made ineffectiveness claim to be raised in the event of an adverse verdict." *Id.* (citation omitted); *accord Commonwealth v. Pander*, 100 A.3d 626, 643 (Pa.Super. 2014).

In *Paddy*, the defendant claimed his counsel was ineffective for failing to call an alibi witness and certain other witnesses. 800 A.2d at 315. However, the defendant had confirmed, in a colloquy with the court during trial, that "counsel had informed him of the witnesses, including alibi witnesses, she

---

[12] Because we agree with the PCRA court that Johnson's claims lacks merit, we need not assess the PCRA court's conclusions regarding the reasonableness of trial counsel's strategies.

intended to call or not call; she had explained to him her strategy in that regard; he understood that he had a right to call alibi witnesses; and he agreed with trial counsel's decision not to call them." *Id.* at 315-16. The Supreme Court held that because the defendant had stated "that the decision not to call alibi witnesses was his as well as trial counsel's, and his decision has not been shown to have been unknowingly, involuntarily, or unintelligently made, [his] allegation of ineffectiveness lack[ed] arguable merit." *Id.* at 316.

Here, Johnston was asked during a colloquy whether he wanted to call Retford to the stand—which he answered in the affirmative—and if any other witnesses existed—which he answered in the negative. Johnston has not asserted that the statements he made under oath were unknowing, involuntary, or unintelligent. Under *Paddy*, 800 A.2d at 316, Johnston is precluded from basing his ineffectiveness claim on a trial strategy to which he assented.

## 2. Ballistics Expert

In his second issue, Johnston complains that his trial counsel was ineffective for failing to hire a ballistics expert. He asserts that such an expert was necessary to rebut the Commonwealth expert's testimony that the same firearm killed both Conner and Labance. Relatedly, Johnston complains that when the PCRA court denied his request for funds to hire a ballistics expert, it denied him due process of law. Johnston argues that without the ability to hire

- 13 -

such an expert at the PCRA level, he was unable to prove how a ballistics expert would have rebutted the Commonwealth's evidence at his trial.

The PCRA court held that Johnston failed to prove that trial counsel was ineffective for failing to hire a firearms expert because Johnston did not explain what evidence such an expert could offer. Similarly, the PCRA court said it denied Johnston's request for funds, because he did not explain what evidence or testimony he expected the expert to offer. In addition, the PCRA court noted that trial counsel cross-examined the Commonwealth's expert, and that Johnston did not assert what testimony an expert could have provided that would have raised doubts that were not already raised by the cross-examination. **See** PCRA Ct. Op. at 11-13. We agree.

"The mere failure to obtain an expert rebuttal witness is not ineffectiveness." **Commonwealth v. Chmiel**, 30 A.3d 1111, 1143 (citation omitted). An appellant must identify an expert witness that was available to testify at trial, and state the nature of the testimony favorable to the appellant's case that the witness would have offered. **Id.** In addition, "trial counsel will not be deemed ineffective for failing to call a medical, forensic, or scientific expert merely to critically evaluate expert testimony [that] was presented by the prosecution," where counsel was "able effectively to cross-examine prosecution witnesses and elicit helpful testimony." **Id.** (quoting **Commonwealth v. Marinelli**, 810 A.2d 1257, 1269 (Pa. 2002)) (alteration in **Chmiel**).

- 14 -

Here, Johnston has not identified an expert witness who was available for trial; as a result, he also was unable to state the substance of the testimony that such a witness would offer.[13] Moreover, Johnston's trial counsel adequately cross-examined the Commonwealth's expert witness. The witness was unable to state the general rate of accuracy in his field for the comparison of fired cartridge casings; admitted that there was no standard quantity of matching marks that cartridges needed to display before he would conclude there was a match in firearms; stated that he was not aware of any studies that have examined the extent of the uniqueness between markings made on the ejected cartridges of different firearms; and acknowledged that there are thousands of nine-millimeter handguns on the streets of Philadelphia. Counsel's cross-examination was designed to expose the weakness of the expert's testimony, and counsel was therefore not ineffective for failing to call a rebuttal expert.

Regarding Johnston's PCRA request to hire an expert to prove his ineffectiveness claim on this point on collateral review, it is true that a PCRA court can "appoint experts . . . to assist an indigent petitioner upon a showing that such assistance is reasonably necessary to the preparation of the

---

[13] For example, it is unclear whether Johnston believes he could have secured an expert who would have affirmatively opined that the cartridges were fired from different firearms, or whether an expert would merely have attempted to discredit the findings of the Commonwealth's expert and opined that no conclusion could be drawn from the evidence.

petitioner's case." ***Commonwealth v. Howard***, 719 A.2d 233, 242 (Pa. 1998). However, the PCRA court need not do so where the "post-conviction petitioner fails to identify a particularized need for such assistance related to a colorable issue presented in his . . . petition." ***Id.*** A petitioner must make "a clear showing as to the content, relevance, and materiality" of the requested expert witness's testimony, before we will find the PCRA court abused its discretion in denying funds for an expert. ***Commonwealth v. Bridges***, 886 A.2d 1127, 1131 (Pa. 2005).

Johnston failed to make such a clear showing. He failed to prove (or even assert) the findings a ballistics expert would have made, and in so doing, failed to demonstrate "the content, relevance, and materiality" of the potential witness's testimony. ***Id.*** Instead, he baldly claims that an expert might prove helpful. ***Id.*** at 1131 (affirming PCRA court's denial of expert funds because appellant "failed to prove the witnesses would provide the desired information"). Finally, because a defendant has no federal constitutional right to PCRA review, and Johnston has not made any claim under the state constitution, Johnston's due process argument is without merit. ***Howard***, 719 A.2d at 241. We therefore conclude that the PCRA court did not abuse its

discretion in denying Johnston's request for funds to hire a ballistics expert during PCRA review.[14]

### 3. Chladek

In his third issue, Johnston complains that his trial counsel was ineffective for failing to object to the Commonwealth's reference to the murder of Paul Chladek, and that the references to Chladek were overly prejudicial and denied Johnston a fair trial. Johnston asserts that his trial "was rife with testimony inferring his involvement in the murder of Paul Chladek," although he does not cite or recite any specific portion of testimony. Johnston's Br. at 23.

The PCRA court found that Johnston failed to prove that any trial reference to Chladek caused him prejudice, because trial "judges, sitting as factfinders, are presumed to ignore prejudicial information in reaching a verdict." *See* PCRA Ct. Op. at 14 (quoting *Commonwealth v. Thomas*, 783 A.2d 328, 335 (Pa.Super. 2001)). The PCRA court stated that it "did not draw any inferences from this information against petitioner." *Id.*

We agree that Johnston is due no relief on this claim. First, the remark that Johnston was involved in Chladek's murder was made during a pre-trial

---

[14] Nor can we agree that there is a reasonable probability that had counsel hired a ballistics expert, the outcome of trial would have been different. None of the other evidence presented by the Commonwealth suggested that Johnston's guilt depended upon the likelihood that he committed both murders with the same firearm. Johnston has therefore also failed to prove prejudice in relation to this claim.

- 17 -

conference; the only relevant testimony at trial was a passing statement by Erin Wood that Chladek was murdered—a statement that the judge, as it appears, may not even have heard—and that did not in any way implicate Johnston. Johnston does not assert that his counsel was ineffective for failing to request, upon Johnston's waiver of his jury rights, that the trial judge recuse herself because she heard the prosecutor's statement about Chladek's "murder."

Moreover, as the PCRA court noted, trial judges are presumed to ignore such extraneous and prejudicial information. That presumption is buttressed in this case by the Commonwealth's admission to the judge that it did not have enough evidence in Chladek's case to prosecute anyone. We therefore affirm the PCRA court's conclusion that Johnston failed to prove prejudice, and deny relief on this ineffectiveness claim.

### 4. PCRA Counsel

Johnston's final issue is the effectiveness of his PCRA counsel, who was permitted to withdraw by the PCRA court. Johnston provides no argument on this point in his appellate brief, and we therefore consider it waived. **See Commonwealth v. Kolovich**, 170 A.3d 520, 526 (Pa.Super. 2017), *appeal denied*, 182 A.3d 429 (Pa. 2018).

Finding no fault in the PCRA court's rejection of Johnston's ineffectiveness claims, we affirm the PCRA court's denial of relief.

Order affirmed.

Judge Olson concurs in the result.

P.J.E. Stevens concurs in the result.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 9/28/2018*